CLARENCE E. and RUBY J. MIDDLEBROOKS, JR., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Middlebrooks v. Commissioner
Docket No. 695-72.
United States Tax Court
T.C. Memo 1975-275; 1975 Tax Ct. Memo LEXIS 99; 34 T.C.M. (CCH) 1187; T.C.M. (RIA) 750275; September 2, 1975, Filed Gordon D. Simonds, for the petitioners. Robert J. Shilliday, Jr., for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1968 in the amount of $12,295.90. The sole issue presented for decision is whether petitioners may deduct as an ordinary and necessary business expense under section 162 of the Internal Revenue Code *100 of 1954, [1] printing expenses paid for producing the first issue of an automotive magazine distributed and sold subsequent to 1968. FINDINGS OF FACT Some of the facts are stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated by reference. The petitioners were husband and wife and resided in Orlando, Florida, at the time they filed their petition. They filed a joint Federal income tax return for the taxable year 1968 with the District Director of Internal Revenue at Jacksonville, Florida, on the cash basis of accounting. Since Ruby J. Middlebrooks is a petitioner by virtue of having filed a joint return with her husband, Clarence E. Middlebrooks, Jr. will hereinafter be referred to as petitioner. Petitioner was the sole shareholder and president of Turbonique, Inc., a Florida corporation which manufactured turbine engines, booster axles and self-powered superchargers utilizing features covered by five United States patents issued to him individually. Prior to 1968, petitioner also published technical *101 manuals and catalogues for corporations with which he was associated. Petitioner had accumulated a large library on "turbo" machinery and a collection of files from various large turbine manufacturers. Various advertising agencies, customers, and publishers of magazines in which petitioner's corporations advertised suggested to him that a magazine dealing with turbine technology be published. In 1967, petitioner contacted certain publishers in this regard and finally decided to establish an independent publishing company to publish the magazine. In 1968, petitioner began to operate as Middlebrooks Publishing Co., a proprietorship, and he assembled a "dummy" turbine car pictorial magazine called "Hot Rotor." On December 11, 1968 Middlebrooks Publishing Co. as "publisher" entered into a distribution agreement with Fawcett Publications, Inc. (the distributor), which provided that Fawcett was to be the exclusive distributor of "Hot Rotor" as an independent contractor for purposes of circulating the magazine throughout the United States and Canada and in specified foreign countries. The agreement provided in part: THIRD: The distributor shall prepare and deliver to the Printer designated *102 by the Publisher, and the Publisher in advance of the release date of each issue of the magazine a shipping galley indicating the number of copies to be shipped to each wholesale distributor or retailer. Said distribution galley shall be arrived at by Distributor by using their knowledge of the market. Title to all such copies shall vest in Distributor from time of delivery thereof by Publisher to a carrier for shipment as prescribed in the aforementioned shipping galley. All costs of packaging, wrapping and transportation to the destinations provided in the shipping galley shall be borne by the Publisher. FOURTH: Distributor shall purchase from the Publisher copies of the Magazine at the rate of 50% off the retail cover price. * * * * *
SEVENTH: The Distributor will make payments to the Publisher on account of the purchase price of the Magazine on the following basis: (a) 10% of the total purchase price of each issue upon notification from the printer that the shipment of the Magazine has been completed. If the freight charges for the shipment of any specific issue of the Magazine have not been paid by the Publisher, the Distributor may deduct such charges from the initial *103 10% payment and pay the same directly to the carrier. The balance of the purchase price will be remitted to the Publisher as full and complete payment of the 25% of the purchase price due and owing under this subdivision of paragraph SEVENTH. (b) Distributor will make an additional advance one hundred and thirty-four (134) days after on-sale based on its own estimate of the total number of copies that will be sold of that issue of the Magazine. (c) Final payment will be made one hundred twenty (120) days after the off-sale date of each issue of the Magazine. The off-sale date shall be agreed upon between Publisher and Distributor. In addition, the contract provided that the distributor was not required to pay Middlebrooks for any unsold copies returned to the distributor by retailers and that all of the distributor's payments to Middlebrooks were subject to adjustment for shipping shortages, previous overpayments, returns, taxes and duties, and additional shipping payments. Termination of the agreement required 180 days written notice by the distributor and one year's notice by Middlebrooks. Two days later, on December 13, 1968, Middlebrooks Publishing Co. executed an agreement *104 with Fawcett-Haynes Printing Corp. of Rockville, Maryland, covering the production of the single issue of "Hot Rotor - Turbine Car Pictorial." The contract provided for printing 210,000 copies at a cost of $55,991.90. The magazines were to be completed and ready for shipment on or about March 3, 1969. Ten thousand magazines were to be shipped to Middlebrooks Publishing Co. and 200,000 copies were to be labeled and shipped (prepaid in petitioner's name) to newsstands in accordance with distribution instructions and shipping galleys which were to be supplied by the distributor; freight bills were to be forwarded to Middlebrooks for payment. The agreement provided that "all said MAGAZINES are for resale and THE PUBLISHER is not subject to Sales Tax." The 10,000 copies shipped to Middlebrooks were to be used as advertising "handouts" and for historical purposes by petitioner. The printing agreement and attached exhibits referred to the magazine at two places as a "catalog." The terms of the contract included the following: TERMS: The publisher agrees to execute a formal assignment of $15,000.00 to be paid to the printer by the distributor 10 days following notification of shipping *105 200,000 copies for newsstand distribution, and further agrees to the payment with the return of your executed copy of this agreement in the amount of $40,991.90. Petitioner mailed his personal check for $40,991.90 to the printer on December 18, 1968. Petitioner obtained from the United States Copyright Office in April 1969 a certificate of registration of a claim to copyright covering "Hot Rotor" as a published book which bore the registration number (Class A) A-59442. The registration was effective for a period of 28 years and renewable for an additional 28 years in the usual course of events. Petitioner's copyrights to "Hot Rotor" were not assigned to either the printer or the distributor; the distributor extended no offer to petitioner to purchase his copyright. The printer completed the magazine during March 1969 and shipped 10,000 copies to petitioner for use as advertising and for historical purposes and shipped 198,861 copies to designated retailers on March 31, 1969. The publication of "Hot Rotor" distributed in April 1969 was a turbine car pictorial which featured more than 60 photographs of race cars and speed boats powered by turbine engines patented by petitioner *106 and manufactured by corporations in which petitioner owned stock; the magazine included approximately 13 photos of petitioner's turbine engines and superchargers which were not attached to a vehicle or boat. The magazine contained three Turbonique advertisements featuring a stock car gas turbine engine, a motorcycle turbine engine, and Turbonique superchargers, respectively. Each advertisement contained a clip-out order form by means of which catalogues, manuals, films and recordings could be obtained from Turbonique. Readers of the magazine responded to the ads and made purchases from Turbonique as a result. It was petitioner's intent to publish the first issue of "Hot Rotor" as a pictorial and subsequent issues as editorial periodicals with annual pictorials interspersed. The publication's retail sales price was $1.50 and its newsstand life was three months to one year depending upon the retailer at which it was displayed. At the time of shipping, a 10 percent advance of $15,000, which had been assigned by petitioner to the distributor, was paid to the printer by the distributor. In September 1969 petitioner received from the distributor a second advance of $15,000 which was *107 based upon estimated sales of 20 percent. In March 1970, at the time of the "off-sale" date, petitioner received a final payment of $15,000 based upon actual retail sales of 60,000 magazines or 30 percent of the total shipped to the retailers. On their joint Federal income tax return for the taxable year 1968 petitioners deducted as a business expense the amount of $40,991.90 paid to the printer for the printing of "Hot Rotor." In his statutory notice of deficiency, the Commissioner disallowed the deduction of $40,991.90 and determined that the payment to the printer was made pursuant to a contract providing for delivery of the magazines in the following taxable year and "that such costs were incurred in connection with the acquisition of property to be acquired for resale subsequent to December 31, 1968." OPINION The sole issue presented is whether petitioner may properly deduct $40,991.90 as an ordinary and necessary business expense in 1968 for printing a magazine which was printed, distributed and sold subsequent to 1968. Petitioner contends that he never received title to the magazines and thus should not be required to consider the magazines as inventory for tax purposes. *108 He argues that the distributor had complete power of disposition over the magazines after the distribution agreement was executed in 1968 and that he, therefore, acquired no physical assets in 1969 when the magazines were printed, distributed and sold. Respondent's position is that petitioner received title to the magazines when they were completed in March 1969 and that the payment of $40,991.90 represented a portion of the cost of the magazines, which were to become petitioner's stock-in-trade for the period between the date of completion and March 1970. He argues that such cost should not be accounted for apart from the sale of the magazines but should constitute part of the cost of goods sold, utilizing inventories of the magazines in accordance with section 471, in order to clearly reflect petitioner's income from the purchase and sale of the magazines. Sec. 1.471-1, Income Tax Regs.
Section 471 provides the Commissioner with broad authority to prescribe the use of inventories by the following language: Whenever in the opinion of the Secretary or his delegate *109 the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. The regulations promulgated thereunder provide that inventories are necessary "ineverycase in which the production, purchase, or sale of merchandise is an income-producing factor." [2] [Emphasis added.] Petitioner relies upon a provision in that section reproduced and emphasized in the footnote which states that merchandise should be included in the inventory "only if title thereto is vested in the taxpayer." In construing his two contracts with the printer and the distributor, petitioner reasons that title to the magazines never vested in him because the magazines were to be delivered by the printer to the carrier (F.O.B. Rockville, Maryland) and title was to "vest in Distributor from time of delivery thereof" to the carrier for shipment, in accordance with article THIRD of the distribution agreement. *110 We are in agreement with respondent that petitioner did hold title to the magazines as his stock-in-trade and resold them in the ordinary course of his trade or business. Since the payment represented the cost of goods purchased for "resale" (as specifically stated in the printing contract), it must be deducted from petitioner's gross sales in the taxable years of sale in computing his gross income. Secs. 1.162-1(a) and 1.61-3(a), Income Tax Regs.
Since the printing contract provided that its terms would be construed and enforced according to the laws of Maryland, the laws of that state are determinative as to whether title to the magazines vested in petitioner at any time. The Uniform Commercial Code, which has been adopted by Maryland, provides in section 2-401 with respect to the passing of title: SEC. 2-401. Passing of title; reservation for security; limited application of this section. Each provision of this subtitle with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except *111 where the provision refers to such title. Insofar as situations are not covered by the other provisions of this subtitle and matters concerning title become material the following rules apply: (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (Sec. 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this article. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the subtitle on secured transactions (subtitle 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties. (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of *112 title is to be delivered at a different time or place; and in particular and despite any reservation of security interest by the bill of lading (a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but (b) If the contract requires delivery at destination, title passes on tender there. [Md. Ann. Code art. 95B, sec. 2-401.] [Emphasis added.] * * * * *
Under Maryland law, title to the magazines clearly passed to petitioner on March 30, 1969 at the "time and place of shipment" since the contract provided in effect that the copies were to be delivered to petitioner as saleable items. Because of the nature of the marketed product it was unnecessary for petitioner to take physical possession of the goods. Actual shipment of the goods, however, was to be made in petitioner's name and at his expense. Identification of the goods to the contract under Md. U.C.C. sec. 2-401(1) was satisfied in that petitioner was to be supplied with a full color proof of the magazine for his approval prior to production printing. In the absence *113 of article THIRD of the distribution agreement, the sale of the magazines to the distributor would have occurred under Md.U.C.C. sec. 2-401(2) at the time and place at which petitioner had completed his performance with reference to the physical delivery of the magazines. That agreement, however, provided as follows: Title to all such copies shall vest in Distributor from time of delivery thereof by Publisher to a carrier for shipment as prescribed in the aforementioned shipping galley. All costs of packaging, wrapping and transportation to the destinations provided in the shipping galley shall be borne by the Publisher. While it may first appear that title bypassed petitioner, such was not the case. In order to effect a sale of the magazines to the distributor on a "sale or return" basis as occurred, it was essential that petitioner own such merchandise. While petitioner may have only possessed title to the magazines for an "instant" while the goods were carted through the carrier's front door, as respondent acknowledges, such possession of title was sufficient to require petitioner to inventory the product as his stock-in-trade under respondent's regulations. Apart from *114 a consideration of the technical passage of title, it is apparent that petitioner intended to and did exercise control and ownership rights over the magazines after their completion. Most significantly, the magazines were to be shipped under petitioner's name and and at his expense and all costs of packaging and wrapping were to be borne by him. The distribution agreement itself contemplated that delivery to the carrier would be performed by petitioner. Moreover, petitioner agreed to indemnify the distributor for all costs and damages during the term of the contract and after its termination, resulting from any civil or criminal proceedings occasioned by any act or omission by petitioner in the publication of the magazine and its distribution by the distributor. In his brief, respondent, for the first time, argues that petitioner must adopt the accrual method of accounting. As the sole issue before us is the deductibility of the cost of printing the magazines, which we have decided in favor of respondent based upon the requirement that the magazines must be inventoried, it is not necessary for us to consider the belated argument made by respondent. Decision will be entered for *115 the respondent.
Footnotes
1. All statutory references are to the provisions of the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. SEC. 1.471-1 Need for inventories. In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. Merchandise should be included in the inventory only if title thereto is vested in the taxpayer.↩ Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers), title to which has passed to the purchaser. A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected. [Emphasis added.]