LIGGETT GROUP, INC., SUCCESSOR IN INTEREST TO LIGGETT & MYERS, INCORPORATED & CONSOLIDATED SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Liggett Group, Inc. v. Commissioner
Docket No. 28427-84
United States Tax Court
T.C. Memo 1990-18; 1990 Tax Ct. Memo LEXIS 18; 58 T.C.M. (CCH) 1167; T.C.M. (RIA) 90018; January 11, 1990
William F. Indoe, John L. Warden, Elise A. Bloustein, and Elliot M. Maza, for the petitioner. Paul G. Topolka, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By notice of deficiency dated May 25, 1984, respondent determined deficiencies in petitioner's Federal income tax as follows: Taxable Year Ending
Deficiencies
December 31, 1971
$  69,294
December 31, 1972
864,644
December 31, 1973
798,702
*20 By an amendment to his answer, respondent determined an additional $ 577,033 deficiency for 1971. Petitioner has stipulated that it will not contest the deficiencies determined for the taxable years 1971 and 1972. Accordingly, there is no longer any issue to be decided for those years. The issue for our decision is whether sales of Scotch whiskey by petitioner's subsidiary Paddington to third party United States customers via "Direct Import In Bond FOB British Isles" produces income from sources without the United States for purposes of section 862(a)(6) [1] for the taxable year 1973. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioner, Liggett Group, Inc., a Delaware corporation, is the successor in interest to Liggett & Myers, Inc., also a Delaware corporation. On or about April 28, 1976, Liggett Group, Inc., was merged into Liggett & Myers. Liggett & Myers was the surviving corporation and its name was *21 changed to Liggett Group, Inc. On or about January 2, 1981, Liggett Group, Inc., was merged into GM Sub Corporation, a Delaware corporation. GM Sub Corporation was the surviving corporation and its name was changed to Liggett Group, Inc. Liggett & Myers was the common parent of a group of corporations that filed a consolidated U.S. corporate income tax return (Form 1120) for the taxable year 1973 with the Internal Revenue Service Center, Holtsville, New York, utilizing the accrual method of accounting. At the time the petition in this case was filed, petitioner's principal place of business was in Durham, North Carolina. Paddington, a Delaware corporation, was a controlled subsidiary that was included in the consolidated U.S. corporate income tax return (Form 1120) filed by its parent, Liggett & Myers, for the taxable year 1973. Paddington became a wholly owned subsidiary on or about June 18, 1973. Prior to that time, Liggett & Myers owned directly and indirectly 97.93 percent of the outstanding common stock of Paddington. During 1973, Paddington's main office and principal place of business was in New York City. Paddington has been the exclusive distributor of J&B Rare *22 Scotch Whiskey (J&B Rare) in the United States market since 1937. Paddington buys J&B Rare from Justerini & Brooks, Ltd. ("J&B") abroad and sells it to its own customers -- principally liquor wholesalers. Although Paddington imports other brands, Paddington's largest selling brand in 1973 was J&B Rare, produced in Scotland by J&B. Paddington and J&B entered into a written agreement on August 3, 1959, with respect to Paddington's exclusive distributorship. This agreement was amended in 1963 to extend its terms from September 30, 1975 to September 30, 1990. The agreement provides, among other things, as follows: 1. (a) J. & B. hereby appoint Paddington and Paddington accepts such appointment as the sole representative of J. & B. in the United States of America (which for the purpose of this Agreement shall mean the States at present comprised therein) for the sale of wines spirits and liqueurs in that country. * * * (c) During the currency of the said appointment J. & B. shall not appoint any other agent agents [sic] representative or representatives in the United States of America for the sale of wines spirits and liqueurs in that country. 2. (a) Paddington shall not *23 import into the United States of America any wines spirits and liqueurs other than those supplied by J. & B. and such other wines spirits and liqueurs as may from time to time be approved in writing by J. & B. (b) In respect of all such other wines spirits and liqueurs as may be imported by Paddington with the approval of J. & B. under the foregoing provisions of this clause Paddington shall pay to J. & B. an overriding commission at the rate of 5s. per dozen or in the case of bulk imports at a corresponding rate. * * * 3. (a) Paddington shall not sell in the United States of America during the currency of the said appointment any wines spirits and liqueurs other than those imported under the terms of Clause 2 hereof and domestic products of the United States of America. * * * 5. (a) J. & B. shall use their best endeavors to supply Paddington with such quantities of their wines spirits and liqueurs as Paddington may require but no guarantee of quantities is given. (b) All goods supplied by J. & B. to Paddington shall be paid for in cash against documents in the United States of America except that J. & B. shall allow to Paddington a trading margin of credit up to a maximum *24 amount at any one time of L5,000 sterling. * * * 7. In the event of: (i) any legislation or Government action in the United States of America preventing the import of wines spirits and liqueurs by Paddington from J. & B. or (ii) any legislation or Government action in the United Kingdom preventing the export of wines spirits and liqueurs by J. & B. to Paddington this Agreement shall be suspended for the period during which such imports or exports as the case may be shall be so prevented and shall automatically come into full force and effect again so soon as such imports or exports as the case may be shall be permitted. 8. (a) The appointment of Paddington hereunder is of a personal nature and the rights of Paddington under this Agreement shall not be capable of being assigned to any other person or corporation. (b) Paddington shall be entitled to appoint sub-agents or representatives in the United States of America for the sale of J. & B.'s products but J. & B. shall not be concerned with any sub-agents or representatives so appointed and shall not be bound to supply or ship goods to any person in the United States of America other than Paddington. * * * 10. If in *25 any calendar year the goods imported into the United States of America by Paddington pursuant to this Agreement shall fall below the number of cases imported by Paddington from J. & B. in the calendar year 1958 unless this shall be due to the failure of J. & B. to ship the quantities required by Paddington J. & B. shall be entitled to terminate Paddington's appointment hereunder by giving to Paddington not less than six months' written notice of such termination. Neither the original nor the supplemental agreement designated whether the laws of the United Kingdom or of the United States were to govern in the event of a dispute between the parties. In 1973, all of Paddington's purchases of J&B Rare from J&B were effected by means of purchase orders that Paddington sent to J&B in London. The orders stated the quantity of particular bottle sizes (quarts, fifths, half-gallons, etc.), the name of the desired carrier to which the order was to be sent for transport to the United States, the desired shipping date, and the port of destination. Upon receipt of Paddington's order at J&B's office in London, Robert Thomas John Lisle, J&B's export director, would send a copy of the order to *26 the J&B warehouse in Scotland where the specified amount of J&B Rare would be loaded into containers, sent by truck to the designated ports, and loaded aboard vessels of the designated carrier for shipment to the United States. Paddington's written purchase orders to J&B did not contain any language concerning freight charges, insurance, risk of loss or when or where the right, title, and interest in the ordered goods were to pass from J&B, the seller, to Paddington, the buyer. The term "F.O.B." does not appear on Paddington's written purchase orders to J&B. For many years, however, including 1973, J&B's exclusive terms of sale to Paddington have been "F.O.B. United Kingdom." J&B and Paddington understood this to mean that Paddington became the owner of the J&B Rare when it was loaded in a timely fashion aboard the ship of the specified carrier docked in the United Kingdom. Thus, according to J&B's Lisle, the understanding was that "we, for a price, will deliver the goods on board that ship. * * * And when the goods pass over the ship's rail and go into the hold of the ship, they are the property of the Paddington Corporation." Neither Paddington nor J&B, however, has expressly *27 stated these terms in a written document. As a result of these transactions, the parties understood that Paddington was unconditionally obligated to pay J&B for the J&B Rare that Paddington purchased. Paddington normally paid J&B within 30 days of receipt of the J&B invoice. During 1973, Paddington sold J&B Rare to its customers by means of two types of procedures: "F.O.B. United States Warehouse" sales (referred to as "Warehouse" sales) and "Direct Import In Bond F.O.B. British Isles" sales (referred to as "Direct Import" sales). In Warehouse sales, Paddington imported the J&B Rare into the United States primarily for its own inventory, and then sold the J&B Rare to its customers on terms F.O.B. United States. In Direct Import sales, the customers acquired the J&B Rare from Paddington in the British Isles on terms F.O.B. United Kingdom, whereupon the customers incurred the subsequent costs of transportation, insurance, tax, duty, and storage of the J&B Rare. The Direct Import sales procedure was generally used by large volume customers ordering at least a full shipping container of J&B Rare at a time. The Warehouse sales procedure was used by Paddington's smaller customers, *28 and by the larger customers when they ran short of J&B Rare and needed a relatively small amount of J&B Rare on very short notice. During 1973, approximately 80 percent of Paddington's $ 75 to $ 80 million total sales of J&B Rare were Direct Import sales. Foreign liquor is subject to excise taxes and duties when it is taken out of bonded customs warehouses in the United States. The excise taxes and duties on distilled spirits approached $ 11 per gallon and approximately equalled the cost of the whiskey to Paddington before the taxes and duties were paid. In Warehouse sales, Paddington had to pay tax and duty upon removal of the whiskey from its bonded warehouse in New York. Paddington's customers were therefore charged for the tax, duty, freight, insurance, and other carrying charges when they bought J&B Rare out of Paddington's New York warehouse. The price per bottle of J&B Rare was higher in a Warehouse sale than in a Direct Import sale because Paddington's price for a Warehouse sale included the aforementioned freight, insurance, tax, duty, and storage charges. For example, in 1973 a typical price for a case of fifths of J&B Rare was $ 53.75, in a Warehouse sale, and only *29 $ 26.35 in a Direct Import sale. Petitioner does not dispute that the Warehouse sales were F.O.B. United States and that the sales were therefore made in the United States. In the case of a Direct Import sale, however, Paddington's customer would already have paid the freight and insurance on the whiskey, and would ultimately be responsible for taxes and duties upon taking the material from a bonded warehouse. Accordingly, the principal advantage to Paddington's customers was in saving on Paddington's handling charges and in being able to control the payment of taxes and duties until they needed the whiskey for their own resales. The commercial advantage to Paddington of selling by Direct Import was that the procedure reduced Paddington's overhead and simplified Paddington's operations because Paddington did not have to insure the whiskey or pay freight or storage charges. Paddington's Direct Import sales were initiated by a purchase order that Paddington received from its customer specifying the number of cases of each bottle size of J&B Rare to be sent, the name of a specific shipping company that the customer wanted to use to ship its whiskey from the United Kingdom to the *30 United States, and the desired delivery date. Nothing appeared in the customers' orders themselves about freight charges, insurance, risk of loss or when or where the right, title, and interest in the whiskey was to pass from Paddington to the customer. The term "F.O.B." did not appear on the customer's order. The customer's order, however, indicated that the order was on terms of "Direct Import," which reflected the understanding between Paddington and its principal customers that they were making an "In Bond, F.O.B. British Isles" sale. Paddington and its customers also understood and agreed that F.O.B. British Isles meant that ownership and risk of loss passed from Paddington to the customer when J&B, at Paddington's direction, loaded the J&B Rare aboard the ship of the specified carrier in a timely fashion in the British Isles. As one of Paddington's principal customers explained, "We own the goods at the moment the merchandise passes the rail of the ship. * * * when those goods are put on the ship, I become the owner and therefore it is my responsibility to insure it." In a Direct Import sale, upon receipt of the purchase order from its customer, Paddington issued its own *31 written purchase order to J&B containing essentially the same information that was in the customer's order and directing J&B to send the J&B Rare directly to such customer on a designated vessel of the carrier that the customer had specified. J&B would then ship the liquor in accordance with the instructions it received from Paddington. Immediately after delivery of the J&B Rare to the shipping line, J&B sent to Paddington the following: (i) a J&B invoice specifying J&B's prices to Paddington; (ii) a copy of a J&B invoice that did not specify J&B's prices; (iii) an original and two copies of a bill of lading showing J&B as the shipper and made to the order of Paddington as the consignee; (iv) a Certificate for Spirits Exported to the United States of America ("Age Certificate"), prepared by J&B, and a document entitled "Wet Goods Ex Bonded Warehouse for Exportation" ("Wet Goods Certificate"), also prepared by J&B. In complying, in part or in whole, with Paddington's written purchase order, J&B sold the goods to Paddington and not to Paddington's United States customers. J&B, in fact, never corresponded with or contacted Paddington's United States customers. As J&B's customer, Paddington *32 was obligated to pay J&B for the goods regardless of whether Paddington's United States customers ultimately paid Paddington. Paddington normally received J&B's invoice three or four days after the date reflected on the invoice, while the goods were in transit. When Paddington received the invoice and the other documents from J&B, it prepared a document entitled "Report of Use or Other Disposition of Red Strip Stamps" (ATF Form 1627), endorsed the bill of lading, and then sent all of these documents (other than the list specifying J&B's prices and the Wet Goods Certificate) to the customer or to the customer's customs broker. Paddington's customers retained such customs brokers to clear the whiskey through U.S. Customs. It was necessary for Paddington to forward these documents promptly, because they were needed for the expeditious release of the goods to the customer. If for some reason the order could not be filled Paddington would notify the customer. Otherwise, the customer received no specific notice of shipping until it received the documents from Paddington. In a Direct Import sale, Paddington's customers then arranged to have the J&B Rare taken from the dock and shipped *33 (usually by truck) to the customers' warehouses where it was kept "In Bond" -- that is, in a segregated area of each such warehouse known as the bonded warehouse, until the customers withdrew the whiskey from bond. Paddington's customers were required to pay the excise tax and duty that were due before removing the J&B Rare from their bonded warehouses and putting it in general inventory for sale to their own customers, such as taverns, restaurants, and liquor stores. In a Direct Import sale Paddington sent an invoice to each customer. The invoice identified the particular products, quantities, and prices, the name of the carrier, the bill of lading number, and the customer's purchase order number. The invoice from Paddington to its customer stated that the terms of sale were "Direct Import In Bond F.O.B. British Isles." There is no indication that any of Paddington's customers ever challenged the terms of Paddington's invoice in a Direct Import sale. In due course, the customer paid Paddington for the J&B Rare that it ordered. The customer also paid the ocean freight, insured the goods, retained a customs broker to clear the goods through U.S. Customs, and paid for a local hauler *34 to bring the goods from the port to its warehouse. Accordingly, in a Direct Import sale, Paddington did not insure the J&B Rare against damage or risk of loss during transit, nor did it pay for transporting the J&B Rare to the United States, nor did it pay excise taxes or duties in connection with the importation of the J&B Rare into the United States. In a Direct Import sale neither Paddington nor its customs broker cleared the J&B Rare through U.S. Customs. These matters instead were taken care of by Paddington's customers. In 1973, Paddington had no manufacturing facilities, branch operations, offices, or employees in the United Kingdom. Paddington's direct activities relating to the sale of the ordered goods to its United States customers took place entirely within the United States. Paddington did not file any income tax returns in the United Kingdom with respect to its sales of wines, spirits, and liquors. The parties agree that Paddington's Direct Import sales during 1973 totaled at least $ 5.5 million. The parties further agree that Paddington's Direct Import sales were not arranged for tax avoidance purposes. OPINION Section 901 of the Code allows a domestic *35 corporation to claim a credit against its Federal income tax liability for foreign income taxes paid, accrued, or deemed paid. Section 904 limits the amount of that credit to that proportion of the tax liability attributable to income from sources outside the United States. The corporation computes the amount of the foreign tax credit by multiplying its total tax liability by a fraction, the numerator of which is the taxable income from sources outside the United States, and the denominator of which is the corporation's total taxable income. In this case, respondent determined that Paddington's Direct Import sales income did not constitute income from sources outside the United States. His determination in effect lowered the numerator of the limiting fraction and thus reduced the amount of foreign tax credit that petitioner could claim. Respondent's determined deficiencies are the result of denying petitioner the foreign tax credits that were computed on the basis of the Direct Import sales' being income from sources outside the United States. Accordingly, we must decide whether the Paddington's "Direct Import" sales produce income from sources outside the United States. Section *36 862 provides that income from sale of goods outside the United States will constitute income from sources outside the United States. Section 1.861-7(c), Income Tax Regs., provides that a sale of personal property takes place "at the time when, and the place where, the rights, title, and interest of the seller in the property are transferred to the buyer. Where bare legal title is retained by the seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss." The regulations thus adopt a practical test of locating the point of a sale; under the provisions of section 1.861-7(c), Income Tax Regs., the seller's retention of bare legal title will not affect the determination that a sale has taken place, so long as the buyer has assumed the beneficial ownership and risk of loss. This approach is consistent with the provisions of the Uniform Commercial Code (UCC) which deal with the passage of title to goods (U.C.C. sec. 2-401(2)(a)) (N.Y. U.C.C. sec. 2-401(2)(a) (McKinney 1962)): [2]
(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller *37 completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them to a destination, title passes to the buyer at the time and place of shipment * * *. *38 The use of the term "F.O.B." raises the presumption that title passes to the buyer on the seller's delivery of goods to the indicated place. We have held that, upon such delivery, both title and the risk of loss during the course of any further shipment pass to the buyer. Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 829 (1981). When the writings between the parties do not indicate a specific intent concerning the passage of title, their intent may then be determined "by their conduct, common usage of the trade in the goods in which they are dealing, and by the circumstances surrounding the transaction." 3 Williston on Sales, sec. 23-5, p. 341 (1974). See Barber-Greene Americas, Inc. v. Commissioner, 35 T.C. 365, 389-390 (1960); Ronrico Corp. v. Commissioner, 44 B.T.A. 1130, 1135-1136 (1941); see also A. P. Green Export Co. v. United States, 151 Ct. Cl. 628, 635-636, 284 F.2d 383, 387-388 (1960). We have held that a taxpayer's holding "momentary title" to goods is sufficient to visit certain Federal income tax ramifications upon that taxpayer. In Epic Metals Corp. and Subsidiaries v. Commissioner, T.C. Memo. 1984-322, *39 affd. without published opinion 770 F.2d 1069 (3d Cir. 1985), we addressed the case of a sales subsidiary that sold metal decking made by its parent and other fabricators. The subsidiary never had physical possession of the metal decking it sold. Whether its orders were filled by its parent or another fabricator, the order was always shipped F.O.B. fabricator's place of business. The subsidiary's customers always had the right to select the mode of transportation and the specific carrier to transport the finished product to the customer's job site. The customer bore the freight charges as well as the risk of any loss or damage to the metal decking during transit under the shipping contract. The parent often dealt with the customer directly concerning the orders. The parent, however, sent its invoice for the metal decking to the subsidiary and the subsidiary paid the invoice by making payments to the parent. The subsidiary then sent an invoice to its customer for the metal decking, and the customer paid that invoice by making payment to the subsidiary. The subsidiary bore the credit risk in the event a customer defaulted on the contract. In Epic Metals, respondent *40 argued that under the applicable provisions of the UCC, title passed from the parent to the subsidiary at the time and place of shipment and that thereafter, title passed from the subsidiary to its customer virtually immediately. Respondent cited the Pennsylvania version of U.C.C. section 2-401(2)(a), supra (Pa. Stat. Ann. tit. 12A, sec. 2-401(2)(a) (Purdon 1970)), which provides that if the seller is authorized to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment. Respondent further contended that when the subsidiary directed the parent to ship the metal decking directly to the customer using the subsidiary's bill of lading and shipping papers, and the parent notified the subsidiary when the order had been shipped, the subsidiary fulfilled the requirements of U.C.C. section 2-504 relating to "Shipment by Seller." (Pa. Stat. Ann. tit. 12A, sec. 2-504 (Purdon 1970)). That provision states as follows: Section 2-504. Shipment by Seller. Where the seller is required or authorized to send the goods to the buyer and the contract does not require *41 him to deliver them at a particular destination, then unless otherwise agreed he must (a) put the goods in the possession of such a carrier and make such a contact for their transportation as may be reasonable having regard to the nature of the goods and other circumstances of the case; and (b) obtain and promptly deliver or tender in due form any document necessary to enable the buyer to obtain possession of the goods or otherwise required by the agreement or by usage of trade; and (c) promptly notify the buyer of shipment. Failure to notify the buyer under paragraph (c) or to make a proper contract under paragraph (a) is a ground for rejection only if material delay or loss ensues. Although the parties in Epic Metals did not expressly set forth the terms for passage of title, we believed that the practices of the parent, the subsidiary, and the ultimate purchaser provided persuasive evidence of their intent to have title pass from the parent to the subsidiary and then to the ultimate purchaser. We therefore held that while the subsidiary "only had momentary title, title even for a moment is sufficient * * *." We accordingly treated the subsidiary as a dealer in inventories, *42 which was required to use the accrual method of accounting for taxes. Sec. 1.446-1(c)(2)(i), Income Tax Regs.
Similarly, in Middlebrooks v. Commissioner, T.C. Memo. 1975-275, 34 T.C.M. 1187, 44 P-H Memo T.C. par. 75,275 at 1164-75, we stated, "While petitioner may have only possessed title to the magazines for an 'instant' while the goods were carted through the carrier's front door, as respondent acknowledges, such possession of title was sufficient to require petitioner to inventory the product as his stock-in-trade under respondent's regulations." We believe that Epic Metals may properly be applied to the facts of this case. The pertinent facts are, in all relevant aspects, the same. Here, as in Epic Metals, the seller, Paddington, never had physical possession of the product it sold in Direct Import sales. Instead, its orders were always shipped F.O.B. the manufacturer's location -- in this case, free on board a vessel of the designated carrier in the United Kingdom, where J&B made the J&B Rare. Here, too, the seller's customers always had the right to select the mode of transportation and the specific carrier to transport the finished product *43 to the customer's location. Here, as in Epic Metals, the customer bore the freight charges as well as any risk of loss or damage to the product during transit under the shipping contract. In both cases, the manufacturer sent its invoice for the goods to the seller and the seller then paid the invoice by making payments to the manufacturer. Here, as in Epic Metals, the seller sent its own invoice to its customer who paid the seller directly. In both cases, the seller bore the credit risk in the event a customer defaulted. As in Epic Metals, Paddington, as the seller, was required to send the goods to its customers without being required to deliver them at destination, within the meaning of U.C.C. section 2-401(2)(a), supra. Additionally, as in Epic Metals, when Paddington directed J&B to ship the goods directly to the customer, and then notified its customers that the goods had been shipped, and were in transit, Paddington fulfilled the requirements of U.C.C. section 2-504 (N.Y. U.C.C. sec. 2-504 (McKinney 1962)), relating to "shipment by seller." As in Epic Metals, Paddington acquired and disposed of title in *44 the goods at issue only momentarily. That-transaction, however, was sufficient to transfer "rights, title, and interest" to those goods and thus constitute a "sale" in the British Isles, within the meaning of section 1.861-7(c), Income Tax Regs.
Respondent attempts to distinguish Epic Metals by urging that in that case all the parties were located in the United States. But respondent has not shown how the mere location of the parties affects the question where, under these facts, a sale has taken place. Moreover, here the sales at issue were between Paddington and its customers, that is, between parties located in the United States. Respondent further attempts to distinguish Epic Metals by urging that there, the seller's documents were used in carrying out the sales, while here, most of the documents were originated by J&B, the manufacturer. Again, we see no basis for distinguishing the current case on that basis. Paddington received the documents from J&B, with the bill of lading made to Paddington's order. Paddington, as seller, then treated these documents as its own, including endorsing the bill of lading to its customer, consistent with the understanding of all *45 involved. Paddington, as seller, additionally prepared its own ATF Form 1627 and invoices for each transaction. Respondent further points out that in Epic Metals, the manufacturer contacted the customers directly, while here, J&B had nothing to do with the ultimate customers; instead, it dealt only with Paddington. If anything, that difference strengthens Paddington's argument that it took title from J&B. If J&B had dealt with Paddington's customers directly, such dealings would seem to be inconsistent with the notion that J&B had passed title to Paddington. The fact that J&B did not deal with Paddington's customers underscores the understanding of all involved that Paddington obtained title from J&B and passed such title immediately to its customers. As respondent's regulations indicate, there is a further basis for holding that Paddington's sales to its customers took place outside the United States. Under section 1.861-7(c), Income Tax Regs., not only title but also beneficial ownership and risk of loss passed from Paddington to its customers in the British Isles. Once the goods had been loaded aboard ship, the customers, not Paddington, insured the cargo, paid the *46 subsequent shipping charges, and engaged customs brokers to bring the goods into the United States. The customers, not Paddington, subsequently paid for transportation of the whiskey to their own warehouses, stored the goods, and, when they took the goods out of bond, ultimately paid excise tax and duty on the goods. On these facts, beneficial ownership and risk of loss passed to the customers in the British Isles. Accordingly, under the terms of the subject regulations, we hold that Paddington's Direct Imports sales produced income from sources outside the United States. Respondent makes a number of arguments in attempting to show that the sales at issue took place in the United States. These arguments, however, do not refute petitioner's demonstration that the sales at issue took place outside the United States. Respondent first argues that Paddington could not have sold the whiskey F.O.B. in the United Kingdom, because Paddington may not have obtained title to the whiskey from J&B at the time the whiskey was placed on the ship. Respondent urges that J&B "may" have retained title, in the form of a "right of disposal" under English law, by virtue of a provision in the 1959 *47 contract. That provision states "all goods supplied by J&B to Paddington shall be paid for in cash against documents in the United States." In support of his argument, respondent offers a treatise on English law of sales, Benjamin's Sale of Goods (3d ed. 1987). The treatise writer acknowledges that a statutory presumption that the seller has reserved a "right of disposal" only applies where the bill of lading is deliverable to the order of the seller or his agent. The writer then states, however (para. 1866): it does not follow that property will pass on shipment merely because the bill of lading is made out to buyer's order. * * * It is submitted that where the contract provides for payment against bill of lading the normal inference would be that the seller had reserved a right of disposal until payment in accordance with the contract had been made. On the basis of this comment, respondent urges that title (or "the property") did not pass to Paddington when J&B delivered goods aboard ship. Respondent urges that the contract provision that "all goods supplied by J&B to Paddington shall be paid for in cash against documents in the United States" meant that J&B had retained *48 a "right of disposal," even though the bill of lading was made to the buyer's (Paddington's) order. The above-quoted provision, however, does not undercut the proposition, settled in English law, as in the law of the United States, that the parties' intention will control the site of passage of title. Section 17(1) of the Sale of Goods Act, 1893, 56 and 57 Vict. ch. 71 (later verbatim Section 17(1) of the Sale of Goods Act, 1979) provides: "Where there is a contract for the sale of specific or ascertained goods the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred." By section 17(2) of those Sales of Goods Acts, for the purpose of ascertaining the intention of the parties concerning the place of passage of title, regard will be given to the terms of the contract, the conduct of the parties, and the circumstances of the case. Cf. Benjamin's Sale of Goods, par. 279: "the law permits [the parties] to settle the point for themselves by any intelligible expression of their intention." Another authority has stated, with respect to the "question whether the seller is to be taken to have reserved a right of disposal" *49 that "the matter is entirely one of intention." Goode, Commercial Law, at 587 (1982). In this regard, the Benjamin treatise also states (Benjamin's Sale of Goods, par. 1489): The subsequent conduct of the seller may be relevant to his intention at the time of shipment: * * * the mere fact that the bill of lading is made out to the buyer's order will not suffice to pass property on shipment if the bill is so dealt with as to show an intention on the part of the seller to retain a right of disposal: e.g. if he sends such a bill to his agent with instructions to deliver it up to the buyer only against payment; or if, though the buyer is named as consignee, the parties later agree that the goods are to remain at the disposal of the seller even after the bill has been sent to the buyers, or if other circumstances indicate that the seller intended to reserve his right of disposal. [Emphasis supplied.] Here, however, J&B's conduct is not consistent with any intention to retain "right of disposal;" in 1973, its conduct, as well as its express intent, was instead only consistent with an intention to pass title on shipment. In this case, although the written contract *50 between Paddington and J&B was silent as to the passing of title to the J&B Rare, both Paddington and J&B understood that the terms of its delivery and title passing were "F.O.B. United Kingdom." That meant, according to J&B's director of exports, "we, for a price, will deliver our goods on board that ship. * * * And when the goods pass over the ship's rail and go into the hold of the ship, they are the property of the Paddington Corporation." That understanding was shared by Paddington. Because a delivery "F.O.B." passes title at the place of delivery, it is clear that J&B effected a passage of title to Paddington when the liquor was loaded aboard the ship -- under either the law of the United States or the law of the United Kingdom. See Miami Purchasing Service Corp. v. Commissioner, supra; and see Rules 5(1) and (2) of section 18 of the Sale of Goods Act, 1893, 56 and 57 Vict. ch. 71; Carlos Federspiel & Co. S.A. v. Charles Twigg & Co. Ltd. [1957] 1 Lloyd's List L.R. 240, 255; Colley v. Overseas Exporters Ltd. [1921] 3 K.B. 302, 306; and the discussion of sales under "strict f.o.b." in Goode, Commercial Law at 587: "In *51 general the property in the goods passes to the buyer when they are placed on board the nominated vessel pursuant to the contract." Indeed, the notion of J&B's retention of a right of disposition is undercut by J&B's very agreement to ship the goods F.O.B.; see Carver, Carriage by Sea, par. 1620 (13 ed. 1982): "the fact that an f.o.b. contract provided only for handing over bills of lading against payment does not affect the seller's obligation under the contract to pass the property to the buyer on shipment." Additionally, J&B shipped the goods directly to Paddington's customers. This action is inconsistent with J&B's retaining a right of disposal in the goods. Paddington's customers were sub-purchasers of J&B's products. As such, even if Paddington did not have clear title to the goods, its customers apparently "will acquire a good title under section 25(1) of the Sale of Goods Act 1979 or under section 2 of the Factors Act 1889, or more probably because the buyer has the express or implied authority of the seller to sell the goods in the ordinary course of business and to confer a good title on sub-purchasers." Benjamin's Sale of Goods, par. 386. Here, by shipping goods *52 directly to Paddington's customers, J&B has clearly expressed or implied that Paddington should sell the goods in the ordinary course of its business and confer a good title upon such purchasers. Moreover, the cited provisions of the Sale of Goods Act, 1979, or the Factors Act, 1889, 52 and 53 Vict. ch. 45, appear to convey good title upon a good faith purchaser. Thus, despite the contract language contemplating that Paddington will "pay cash against documents," that language would not appear to interfere with Paddington's passing good title to its customers, F.O.B. United Kingdom, or anywhere else. Additionally, if, in 1973, J&B had wanted to reserve a right of disposition, we do not doubt that it would have done so directly, either with unambiguous language or by the expedient of making the bill of lading out to itself, or to its agent, to be endorsed to Paddington only when the invoice was paid. Such a practice would have been consistent with accepted provisions of the common law that were codified in the Sale of Goods Act, 1893, 56 and 57 Vict. ch. 71 (later in the Sale of Goods Act, 1979) section 19(1) and section 19(2). Benjamin's Sale of Goods, para. 371. Here, however, *53 it did not do so. In sum, neither by its words or actions did J&B indicate that it intended to withhold title in the interests of retaining a "right of disposition" to the goods at issue once they were on board ship. Any contrary intention of the parties indicated by the "cash against documents in the United States" language is vitiated by the fact that the parties had varied that term of the 1959 agreement by their conduct. Here, by 1973, Paddington and J&B had agreed that, notwithstanding the "cash against documents" language, Paddington would not pay for the whiskey until 30 days following Paddington's receipt of J&B's invoice. The "cash against documents" language appears to have become inoperative by 1973. Other provisions in the original contract -- such as the provision of a credit of 5,000 pounds sterling as an exception to the "pay against documents" requirement -- also operated against the assumption that J&B intended to retain a "right of disposal" in the goods sold. See Goode, Commercial Law, supra at 588-589. These credit provisions were, however, obsolete by 1973, when a single invoice would exceed that margin. We are thus convinced on this record that the *54 express and actual intent of the parties was that J&B should pass title to the J&B Rare in Direct Import sales at the time the whiskey was delivered aboard ship. Respondent next argues that the 1959 written contact, which provides that Paddington will have exclusive rights to sell J&B Rare in the United States, operates to prevent Paddington from transferring title to the J&B Rare to its customers in the United Kingdom. We disagree. The contract language provides: "J. & B. hereby appoint Paddington and Paddington accepts such appointment as the sole representative of J. & B. in the United States of America * * * for the sale of wines spirits and liqueurs in that country." A fair reading of the contract shows that it was meant to guarantee Paddington exclusive rights to commercial exploitation of the market for J&B Rare in the United States; the question of where Paddington passed title to its customers was not addressed in the contract and was a matter of no concern to J&B. Respondent attempts to read too much into the contract when he tries to stretch its terms to preclude the passage of title to Paddington's customers in the United Kingdom. Respondent next turns to the dealings *55 between Paddington and its customers. He urges that in order for a sale to take place under the UCC, it was necessary that there be a contract between Paddington and its customers either before or at the time of the passage of title. Respondent then argues that there was no such contract when the goods were shipped, because the customer did not even know that the goods had been shipped until receipt of the bills of lading and other documents from Paddington. Hence, he concludes there was no sale in the United Kingdom. It is settled, however, that performance by the offeree may constitute acceptance, and thus form a binding contract. Section 2-206 of the UCC (N.Y. U.C.C. sec. 2-206 (McKinney 1962)) provides: (1) Unless otherwise unambiguously indicated by the language or circumstances (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances; * * * (2) Where the beginning of a requested performance is a reasonable mode of acceptance an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed before acceptance. Here, Paddington's *56 customers ordered J&B Rare for delivery on specified carriers by specified dates. The long-established practice was for Paddington to undertake acceptance by performance -- that is, by placing its orders with J&B for shipment on the terms requested by the customer. In the event a customer's order could not be filled, Paddington would seasonably notify the customer of that fact. Otherwise, the customers were entitled to understand that the contract was accepted, and that it became the owner of the goods F.O.B. United Kingdom. Delivery would then take place at the times, and on the terms, specified by the customer. This practice appears to have been "reasonable in the circumstances," and the manner of informing the customer of the shipment appears to be notification within a reasonable time. See U.C.C. section 2-208 (N.Y. U.C.C. sec. 2-208 (McKinney 1962)), which provides that a repeated course of performance is relevant in determining the parties' agreement in the contract of sale. The facts here show that a contract was formed by Paddington's performance in response to a customer's order, and that such a contract was made well in advance of the F.O.B. delivery *57 in the British Isles. See American Bronze Corp. v. Steamway Products, 8 Ohio App. 3d 223, 456 N.E. 2d 1295 (1982); Farnsworth, Contracts, sec. 3.15 (1982). Nothing in the record suggests otherwise. Respondent then urges that the failure of Paddington to perform any activities directly in the United Kingdom prevents title from passing from Paddington to its customers in the United Kingdom. As noted above, we have determined that Paddington validly passed title in accordance with U.C.C. section 2-401(2) (N.Y. U.C.C. sec. 2-401(2) (McKinney 1962)), which provides: (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them to a destination, title passes to the buyer at the time and place of shipment * * *. Respondent, however, urges that the above provision does not apply, and that the applicable provision instead is U.C.C. section 2-401(3) (N.Y.U.C.C. sec. 2-401(3) (McKinney 1962)), which states: (3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods, (a) if the seller is to deliver a document of title, title *58 passes at the time when and the place where he delivers such documents * * * Respondent contends that Paddington was not required to move the goods before making delivery, and that, under U.C.C. section 401(3), title to the goods thus did not pass to Paddington's customers until the customers received bills of lading (as documents of title) from Paddington. This reasoning provides an overly strict interpretation of that measure as applied to the facts of this case. Initially, the facts of this case show that Paddington's customers contemplated that, by delivering the goods F.O.B. British Isles, Paddington would in fact move the goods, at least from where the J&B Rare was manufactured in Scotland to the ship on which the whiskey was to begin its voyage to the United States. Paddington in fact fulfilled this obligation by arranging with J&B to deliver the whiskey on board the ship. Respondent's contention that Paddington was to make delivery without moving the goods makes sense only if respondent can show that Paddington was not allowed to arrange with another party to move the goods. Respondent, however, has not shown this to be the situation. Nor do we believe that UCC section *59 401(3) contemplates that delivery F.O.B. must be made by the seller personally. Instead, that provision appears to address situations where the goods are not to be moved at all, as in the case of goods sold that will remain warehoused, notwithstanding their sale. See Hawkland, Uniform Commercial Code Service: Article 2, sec. 2-401:4 (1982). Additionally, in Epic Metals Corp. v. Commissioner, T.C. Memo. 1984-322, affd. 770 F.2d 1069 (3d Cir. 1985), discussed above, the seller did not personally move the goods. We nevertheless held that the seller obtained title to goods it sold, even though it was never present and in possession of the goods, which it had sold F.O.B. the fabricator's plant. Respondent makes other arguments to the effect that delivery in a strict legal sense, or the perfection of a security interest under the UCC, had not taken place until the bill of lading, as a document of title, was delivered to the customers in the United States. Respondent concludes therefore that a sale had not taken place until Paddington either transmitted the bills of lading to its customers, or until the customers had, in fact, received the bills of lading. *60 These arguments of respondent, however, are under these facts inconsistent with both the governing regulations as well as the applicable provisions of the UCC. As discussed above, section 1.861-7(c), Income Tax Regs. states that a sale takes place where "rights, title and interest" are passed to the buyer. The same provision also states that "where bare legal title is retained by the Seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss." The UCC provides that title passes at the point of shipment -- that is, "at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading." UCC sec. 2-401(2), supra (emphasis supplied). Respondent has shown us no authority that would undercut the provisions in the Regulations and in the UCC showing that, in an F.O.B. contract, title passes when the goods are delivered to the designated *61 place for shipment despite the fact that a bill of lading is not delivered to the buyer until afterward. Moreover, even if right, title and interest had not passed within the meaning of section 1.861-7(c), Income Tax Regs., respondent has not overcome petitioner's demonstration that, in Direct Import sales of J&B Rare, the beneficial ownership and risk of loss passed to Paddington's customers outside the United States. Finally, the facts of the unreported case Philipp Bros. Inter-Continent Corp. v. United States, an unreported case ( S.D.N.Y. 1966, 17 AFTR 2d 1072, 66-1 USTC par. 9421), relied upon by the respondent, are not inconsistent with the result we reach here, where tax avoidance is not an issue. In fact, in Philipp Bros., the District Court stated, "where * * * title is to pass upon performance of some act -- for example delivery F.O.B. ship -- title passes in succession to each purchaser upon performance of the act." 66-1 USTC at 86,002. That statement is consistent with the conclusion we have reached here. Petitioner has demonstrated to our satisfaction that Paddington both acquired and transmitted title to the goods at issue F.O. *62 B. United Kingdom. Additionally, petitioner has demonstrated that beneficial ownership and risk of loss passed to its customers outside the United States. Accordingly, the source of Paddington's income from Direct Import sales in 1973 was income from sources without the United States, and petitioner is entitled to utilize the foreign tax credit of $ 798,702 for that year. Because of concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year at issue.↩
2. The parties to this case have treated the provisions of the Uniform Commercial Code as dispositive in sales between Paddington and its customers, and we agree. The income at issue was generated as a result of dealings between United States corporations (i.e., Paddington and its various customers); the orders for the goods involved were made and accepted in the United States; and the goods were billed and paid for in the United States. See Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 828 n.6 (1981); see also Comment 3 to U.C.C. sec. 1-105 (N.Y.U.C.C. sec. 1-105↩ (McKinney 1962)): "Application of the Code in such circumstances may be justified by its comprehensiveness, by the policy of uniformity, and by the fact that it is in large part a reformulation and restatement of the law merchant and of the understanding of a business community which transcends state and even national boundaries." Additionally, the parties have agreed that the experience of Colony Liquors, Inc., is representative of all of Paddington's customers. Because both Colony Liquors and Paddington are located in the State of New York, our citations to the Uniform Commercial Code include parallel citations to its provisions as enacted by the State of New York.