AMERICAN BRONZE CORPORATION, APPELLEE, *v.* STREAMWAY PRODUCTS, APPELLANT.

(No. 44828—Decided December 16, 1982.)

*Mr. Thomas A. McCormack,* for appellee.

*Mr. James M. Petro* and *Mr. Robert C. McClelland,* for appellant.

PRYATEL, C.J. This appeal arises solely from a counterclaim brought by defendant-appellant, Streamway Products, alleging that the plaintiff-appellee, American Bronze Corporation,[1] breached its contract to produce certain equipment for defendant Streamway. The case was tried to the court which, on the basis of the evidence heard, entered the following Findings of Fact and Conclusions of Law:

Findings of Fact

"1. The parties stipulated to the sum of Nine Thousand Four Hundred Eighty-nine Dollars and Sixty-four Cents ($9,489.64), due on account as alleged by American in its Complaint.

"2. Purchase Order No. B 03210, (Streamway's Exhibit A) dated November 21, 1979, was sent to American confirm-ing a telephone order for same. American accepted said Purchase Order and pro-duced all of the #108-R castings ordered, but refused to deliver the one thousand (1,000) #961-IH castings which were ordered. Streamway was notified of American's refusal to produce said cast-ings on January 24, 1981 [*sic*].

"3. Purchase Order No. C 1029, (Streamway's Exhibit B) dated December 27, 1979, was sent to American confirm-ing a telephone order for same. American accepted said Purchase Order requiring the production of thirteen thousand (13,000) #13789-R castings. American partially performed on said order deliving [*sic*] five thousand eighty-seven (5,087) of the castings ordered, but American re-fused to deliver the remaining seven thou-sand nine hundred thirteen (7,913) castings outstanding. Streamway was notified of American's refusal to produce said castings on January 24, 1980.

"4. Purchase Order No. C 1036, (Streamway's Exhibit C), dated January 3, 1980, was sent to American confirming a telephone order for same. American ac-cepted said order but then failed to deliver any of the three (3) types of castings ordered. Streamway was notified of American's refusal to produce said castings on January 24, 1980.

"5. Purchase Order No. C 1076 (Streamway's Exhibit D), dated January 14, 1980, was sent to American confirm-ing a telephone order for same. American on January 18, 1980, returned said order refusing to produce the requested castings.

"6. On January 17, 1980, Gerald Goldstein (Goldstein), American's Vice-President, in a telephone conversation, in-formed Ronald Varesco (Varesco), Streamway's Plant Manager and Joseph DiGiacomo (DiGiacomo), Streamway's

_____
[1] For purposes of clarity, because this case deals with an appeal from a counterclaim, "American" has been substituted for plaintiff-appellee and "Streamway" for defendant-appellant.

President, that American would no longer accept new Purchase Orders from Streamway but that American would produce all open orders then in existence.[2]

"7. On January 24, 1980, in a telephone conversation between Goldstein and Varesco, Goldstein informed Varesco that American would not produce the castings which were on open order with Streamway, and in addition, that American had melted down any of the castings which had been produced for said open orders.

"8. As a result of American's refusal to produce the castings on open order, Streamway placed orders with Wolverine Brass Works in Grand Rapids, Michigan, for cover for said castings. These orders were reflected in Purchase Order Nos. C 1092; C 1089; C 1134; C 1126; and C 1090 (Streamway's Exhibits, E, F, G, H, and I respectively.)

"9. The difference in price which Streamway had to pay for cover of those items which American refused to produce was Sixteen Thousand Three Hundred and One Dollars and Thirty Cents ($16,301.30). The cost to Streamway in converting castings #1108 to castings #108 which American refused to produce was Two Thousand Three Hundred Seventy-four Dollars and Eleven Cents ($2,374.11). The cost of retooling due to American's refusal to produce various castings which had been on open order was Two Thousand Nine Hundred and Seventy Dollars ($2,970.00). Other miscellaneous costs incurred by Streamway as [sic] result of American's refusal to produce the castings on open order was Three Thousand Five Hundred Dollars ($3,500.00). The total cost incurred by Streamway as a result of American's action was Twenty-five Thousand One Hundred Forty-five Dollars and Forty-one Cents ($25,145.41).

"10. None of Streamway's active and running tooling was removed from American's foundry until American refused to produce the castings on open order on January 24, 1980.

"11. American was the only supplier to Streamway for the castings at issue in this case, and Streamway's castings were unique and were custom made by American. There was no duplication of tooling with another foundry.

"12. Streamway did not cancel its open orders with American.

"13. American requested adequate assurances from Streamway in order to continue production of castings. The assurances requested were bringing their account current, paying future invoices within ten (10) days, arriving at an agreed price for scrap returned, and holding American harmless for any failure to produce the castings. Streamway, on January 18, 1980, delivered a check in excess of Sixty-six Thousand Dollars ($66,000.00), which brought its account current with American.

"14. In the normal course of dealing Streamway would call in orders to American and then confirm same in writing with a purchase order.

"15. American accepted the purchase orders at issue.

"16. All exhibits presented were found to be admissible into evidence.

"Conclusions of Law

"1. American is due the sum of Nine Thousand Four Hundred Eighty-nine Dollars and Sixty-four Cents ($9,489.64), on account with statutory interest at the rate of eight percent (8%) per annum beginning December 3, 1981.

"2. It was not a commercially unreasonable period of time, from November 21, 1979, to January 24, 1980, for American to unilaterally rescind its ac-

---

[2] The reason given by American's Vice-President, Goldstein, for no longer accepting Streamway's orders was that Streamway had placed orders with other manufacturers that could have been filled by American.

ceptance of part of Purchase Order No. B 03210, and therefore, there was no breach of contract.

"3. It was not a commercially unreasonable period of time, from December 27, 1979, to January 24, 1980, for American to unilaterally rescind its acceptance of part of Purchase Order No. C 1029, and therefore, there was no breach of contract.

"4. It was not a commercially unreasonable period of time from January 3, 1980, to January 24, 1980, for American to unilaterally rescind its acceptance of Purchase Order No. 1036, and therefore there was no breach of contract.

"5. American received adequate assurances from Streamway in the form of full payment on account on January 18, 1980, however, American was still justified in unilaterally rescinding the three above mentioned purchase orders on January 24, 1980.

"6. There being no breach of contract, Streamway has no damages.

"7. Judgment is granted on the Complaint in favor of American in the sum of Nine Thousand Four Hundred Eighty-nine Dollars and Sixty-four Cents ($9,489.64), with statutory interest at the rate of eight percent (8%) per annum from December 3, 1981, and against Streamway with costs to Streamway.

"8. Judgment is granted to American on Streamway's Counterclaim with costs to Streamway."[3]

Based on these findings and conclusions, the trial court held that American had not breached any of the contracts and therefore that Streamway had no damages provable in its counterclaim. It is from this judgment that Streamway now appeals citing three assignments of error.

### Assignment of Error No. I

"I. The trial court erred in concluding, as a matter of law, that there was no breach of contract by the appellee."

Streamway here contends that American and Streamway did enter into three binding contracts and that American repudiated those binding agreements.

Under R.C. 1302.07, a liberal definition governing the formation of sales contracts is given:

"(A) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"(B) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

"(C) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

R.C. 1302.09 complements this section by defining what constitutes "offer" and "acceptance":

"(A) Unless otherwise unambiguously indicated by the language or circumstances:

"(1) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

"(2) an order or other offer to buy goods for prompt or current shipment

---

[3] American contends that these findings and conclusions are not a proper part of the record before this court due to the fact that they were journalized after the record had been transmitted to this court and were not included in that original record. Nevertheless, we accept these findings as part of the record based on the ruling in *Cobb* v. *Cobb* (1980), 62 Ohio St. 2d 124 [16 O.O.3d 145]. Furthermore, the time to appeal is tallied from the date the judgment is journalized and not that on which the findings and conclusions of the court are filed. App. R. 4(A). Hence, Streamway had no alternative but to file and protect its right to appeal after the court's decision, but prior to the filing of its findings and conclusions.

shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods, but such a shipment of non-conforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

"(B) Where the beginning of a requested performance is a reasonable mode of acceptance an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed before acceptance."

These provisions serve to define how a contract may come into existence.

Generally, the submission of a purchase order is viewed as being an offer which may then be accepted or rejected by the seller. *J.B. Moore Electrical Contractor, Inc.* v. *Westinghouse Electric Supply Co.* (1981), 221 Va. 745, 273 S.E. 2d 553. As the language in R.C. 1302.07 indicates, a contract may be shown "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

In the instant case, the parties always used the same procedure in placing and accepting orders. Streamway would first call in the order by telephone and then follow it up with a written purchase order at which time American would begin production. The filling of these orders in this manner as a regular practice[4] constituted a valid acceptance and thus created a binding contract.

Moreover, as to two of these contracts performance had already begun. Under R.C. 1302.07(A), conduct sufficient to show agreement, including performance, is a reasonable mode of acceptance and therefore the agreements became binding at the moment production began. *Nasco, Inc.* v. *Dahltron Corp.* (1979), 74 Ill. App. 3d 302, 392 N.E. 2d 1110. Absent a notice of rejection Streamway would be justified in believing that American had indeed begun production.

The trial court in its Findings of Fact Nos. 2, 3, 4, and 15 also held that American accepted these purchase orders, thus noting the existence of the contracts. We agree and hold that the parties did enter into the three contracts in issue.

Streamway's reliance on R.C. 1302.04(B) to prove the existence of these contracts is not well-founded. R.C. 1302.04[5] is a statute of frauds and as such merely sets out the requirements of a

---

[4] The parties had been doing business in this manner for over twenty years.

[5] R.C. 1302.04 provides:

"(A) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

"(B) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to its contents is given within ten days after it is received.

"(C) A contract which does not satisfy the requirements of division (A) of this section but which is valid in other respects is enforceable:

"(1) if the goods are to be specifically manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

writing necessary to enforce an oral contract. The only effect of meeting these requirements is to take away the statute of frauds as a defense to an oral contract. The burden of persuading the trier of fact that a contract was in fact made orally prior to any written confirmation is unaffected. *Tipton* v. *Woodbury* (C.A. 5, 1980), 616 F. 2d 170. Compliance with R.C. 1302.04(B) then, does not establish the contracts, but would only prevent the statute of frauds from being raised as a defense to an oral contract. Here, we find that American's acceptance of the purchase orders was sufficient to indicate that these contracts for sale had been made.

Streamway next contends under this assignment of error that American's refusal to perform was an anticipatory repudiation of the contracts.

Although "anticipatory repudiation" is not defined in the Revised Code, the case law and official comments to R.C. 1302.68 provide a detailed definition. "Anticipatory repudiation" occurs where one party " 'repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other.' " *Columbia Gas Transmission Corp.* v. *Larry H. Wright, Inc.* (S.D. Ohio 1977), 443 F.

Supp. 14, 21. Official Comment 1 to R.C. 1302.68 states that: "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Such indication must be a definite and unequivocal refusal to perform. *Copylease Corp. of America* v. *Memorex Corp.* (S.D.N.Y. 1975), 403 F. Supp. 625; see, also, *Marr Enterprises, Inc.* v. *Lewis Refrigeration Co.* (C.A. 9, 1977), 556 F. 2d 951. Furthermore, the court in *Flavorland Industries* v. *Schnoll Packing Corp.* (1979), 167 N.J. Super. 376, 400 A. 2d 883, held that repudiating a contract for the sale of goods does not rescind the contract, but constitutes a breach of it.

In the case at bar, American's Vice-President, Gerald Goldstein, stated unequivocally on January 24, 1980 that American would not perform any further on the three contracts and in fact had melted down those units already produced. See Finding of Fact No. 7, *supra.* Consequently, Streamway then rightfully removed the tooling necessary to produce these parts. The value of the contracts to Streamway was substantially impaired in that a new producer of the parts had to be found at substantial cost to Streamway. See Finding of Fact No. 9.[6] Therefore,

"(2)  if the party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

"(3)  with respect to goods for which payment has been made and accepted or which have been received and accepted in accordance with section 1302.64 of the Revised Code."

[6] Finding of Fact No. 9 describes Streamway's actions following the breach and lists its damages as follows:

"The difference in price which Streamway had to pay for cover of those items which American refused to produce was Sixteen Thousand Three Hundred and One Dollars and

Thirty Cents ($16,301.30). The cost to Streamway in converting castings #1108 to castings #108 which American refused to produce was Two Thousand Three Hundred Seventy-four Dollars and Eleven Cents ($2,374.11). The cost of retooling due to American's refusal to produce various castings which had been on open order was Two Thousand Nine Hundred and Seventy Dollars ($2,970.00). Other miscellaneous costs incurred by Streamway as [sic] result of American's refusal to produce the castings on open order was Three Thousand Five Hundred Dollars ($3,500.00). The total cost incurred by Streamway as a result of American's action was Twenty-five Thousand One Hundred Forty-five Dollars and Forty-one Cents ($25,145.41)."

American anticipatorily repudiated these contracts and became liable to Streamway.

Nevertheless, the trial court concluded as a matter of law that American rescinded these contracts within a commercially reasonable time, thus causing no breach of the contracts.[7] We find these conclusions erroneous. The action taken by American was not "rescission" as defined by the Ohio Uniform Commercial Code. Official Comment 3 to R.C. 1302.12 defines "rescission" as including "abandonment or other change by *mutual* consent" (emphasis added); it does not include unilateral termination or cancellation. Thus, American's unilateral act of disavowing the contracts does not create a rescission.

Streamway argues that American terminated the contractual relationship and in doing so failed to give reasonable notice. Likewise, we cannot agree to this categorization of American's acts. Termination is explicitly defined in R.C. 1302.01(A)(13) as occurring "when either party pursuant to a power created by agreement or law puts an end to the contract *otherwise than for its breach*" (emphasis added). This is supplemented by the language of R.C. 1302.22(B) and (C) as well as Official Comments 7 and 8 to those sections stating that "termination" deals with contracts indefinite in duration.[8] The contracts in the instant case were for a definite duration (the production of a number of units) and therefore are not subject to termination as provided in R.C. 1302.22(B).

American's actions in repudiating the contracts in the case *sub judice* led to Streamway's removal of its tooling on January 24, 1980, thereby cancelling the contract with American. Repudiation of a

---

[7] The pertinent Conclusions of Law are as follows:

"2. It was not a commercially unreasonable period of time, from November 21, 1979, to January 24, 1980, for American to unilaterally rescind its acceptance of part of Purchase Order No. B 03210, and therefore, there was no breach of contract.

"3. It was not a commercially unreasonable period of time, from December 27, 1979, to January 24, 1980, for American to unilaterally rescind its acceptance of part of Purchase Order No. C 1029, and therefore, there was no breach of contract.

"4. It was not a commercially unreasonable period of time from January 3, 1980, to January 24, 1980, for American to unilaterally rescind its acceptance of Purchase Order No. 1036, and therefore there was no breach of contract."

[8] R.C. 1302.22(B) and (C) and Official Comments 7 and 8 read as follows:

"(B) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

"(C) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable."

"7. Division (B) applies a commercially reasonable view to resolve the conflict which has arisen in the cases as to contracts of indefinite duration. The 'reasonable time' of duration appropriate to a given arrangement is limited by the circumstances. When the arrangement has been carried on by the parties over the years, the 'reasonable time' can continue indefinitely and the contract will not terminate until notice.

"8. Division (C) recognizes that the application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement. An agreement dispensing with notification or limiting the time for the seeking of a substitute arrangement is, of course, valid under this division unless the results of putting it into operation would be the creation of an unconscionable state of affairs."

contract by one party leaves the other free to cancel and resort to its remedies for breach. *Pillsbury Co.* v. *Ward* (Iowa 1977), 250 N.W. 2d 35, 41. In *Pillsbury,* the buyer extended the date for delivery, thus reducing the value of the contract to the seller. This was found to constitute a repudiation of the contract and to entitle the seller to cancel and resort to his remedies for breach. In the instant case, American has refused to perform further under these contracts thus allowing Streamway to cancel and resort to its remedies under R.C. 1302.85,[9] including "cover" as defined in R.C. 1302.86.[10] This is precisely what Streamway did in response to American's breach, Accordingly, Streamway's first assignment of error is sustained.

### Assignment of Error No. II

"II. The trial court erred in concluding, as a matter of law, that the appellee was justified in unilaterally rescind-

ing the contracts with appellant after receiving adequate assurances of performance from the appellant."

Streamway here argues that American was bound to these contracts after receiving adequate assurances of performance from Streamway.

Under R.C. 1302.67, either party may require adequate assurances of performance from the other when there are reasonable grounds for insecurity.[11] According to Section (B), between merchants, the reasonableness of the grounds for insecurity as well as the adequacy of the assurances offered will be determined according to commercial standards, including the obligation of good faith. See Official Comment 3. Furthermore, the reasonableness of the grounds for insecurity is a question of fact. *Diskmakers, Inc.* v. *DeWitt Equipment Corp.* (C.A. 3, 1977), 555 F. 2d 1177; *AMF, Inc.* v. *McDonald's Corp.* (C.A. 7, 1976), 536 F. 2d 1167.

---

[9] R.C. 1302.85 pertinently reads:

"(A)  Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, as provided in section 1302.70 of the Revised Code, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid:

"(1)  'cover' and have damages under section 1302.86 of the Revised Code as to all the goods affected whether or not they have been identified to the contract; or

"(2)  recover damages for non-delivery as provided in section 1302.87 of the Revised Code."

[10] R.C. 1302.86 defines "cover":

"(A)  After a breach within the preceding section, the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

"(B)  The buyer may recover from the

seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as defined in section 1302.89 of the Revised Code, but less expenses saved in consequence of the seller's breach.

"(C)  Failure of the buyer to effect cover within this section does not bar him from any other remedy."

[11] R.C. 1302.67 reads in part:

"(A)  A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

"(B)  Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards."

The adequacy of the assurances given is subject to the same test of reasonableness. See Official Comment 4. Good faith requires that the party against whom the assurances are requested provide that which should reasonably assure his performance. Again, between merchants this is to be determined according to commercial standards.

In the instant case, American asked for assurances of performance in the form of payment of all outstanding accounts, payment of all new accounts within ten days of delivery, a new policy on return of scrap metal and American being held harmless for a failure to produce the castings. One day after this request, Streamway tendered a check in full payment of its past due accounts. Furthermore, Streamway agreed to pay all future invoices within ten days of delivery. American in return agreed to produce all open orders then in existence.[12]

The reasonableness of this request is not contested, only the adequacy of the assurances given is in issue. As a matter of law, the trial court held these assurances to be adequate but that American was still justified in unilaterally "rescinding" the contract. We agree that the assurances given were commercially reasonable to insure Streamway's performance, but we cannot agree that American was still entitled to unilaterally breach the contract. Having received adequate assurances, American was bound to perform and its failure to do so rendered it liable to Streamway.

Accordingly, Streamway's second assignment of error is sustained.

### Assignment of Error No. III

"III. The trial court erred in concluding that there was no breach of contract based upon the trial court's findings of fact, as well as the manifest weight of the evidence."

Streamway contends that the Findings of Fact entered by the trial court do not support that court's Conclusions of Law holding that there were no breaches of the contracts involved. For the reasons previously set forth in this opinion, we agree. The court found and the evidence supports the existence of three contracts between the parties. The trial court's Conclusion of Law that American's notification of "rescission" was given in reasonable time to prevent a breach is erroneous. Once a contract is entered into, notice unsupported by law may not be utilized to excuse performance without liability. When American repudiated the contracts, Streamway was free to pursue its remedies under the Ohio Uniform Commercial Code.

Accordingly, Streamway's third assignment of error is sustained.

Judgment is reversed and remanded on the counterclaim.

*Judgment reversed and remanded on counterclaim.*

PARRINO and MARKUS, JJ., concur.