OPINION
Plaintiff-appellant, EFA Associates, Inc., appeals from a judgment of the Ohio Court of Claims finding that defendant-appellee, Department of Administrative Services ("DAS"), did not breach the terms of its printing contract with plaintiff.
The state of Ohio's Office of State Printing, part of DAS, provides printing services to numerous state agencies, and it contracts on their behalf to obtain printing services from outside vendors. In 1996, DAS allowed minority-owned business enterprises to competively bid on a two-year term contract to provide book printing services for various state agencies from October 7, 1996 to October 6, 1998.
The term contract included printing and binding of booklets. The printing services, also called presswork, involved running large sheets of paper through a press that prints text, provided by DAS, on both sides of the paper to create multiple-page sheets called "press forms." Depending on the size of the press and the size of the pages to be printed, a press form may contain four, eight or 16 separate printed pages of text on a single sheet of paper. A "half-size" press is able to print a press form on 17 1/2; inch by 22 inch paper; a "full size" press is able to print press forms on paper that is twice as large, 35 inches by 22 inches. If the pages of text to be printed on the press form are letter size, or 8 1/2; inches by 11 inches, a half-size press can print four separate letter-size pages of text on each side of a press form, resulting in an eight-page press form. In comparison, a full-size press can print eight separate letter-size pages of text on each side of a press form, resulting in a 16-page press form.
In the bindery operation, each press form is "folded" so that the pages appear in the correct order and the edges of the pages are cut. The result is called a "signature." An eight-page signature, four separate pieces of paper printed on the front and back, will create eight pages in a book; a 16-page signature will render 16 pages in a book. Thus, 16 pages in a book can be created using one 16-page signature, two eight-page signatures, or four four-page signatures. After the requisite number of signatures have been made to create the number of pages that will comprise a book, the signatures are bound with a cover into a finished booklet.
Prior to letting the term contract at issue for bid, DAS was aware most minority printing contractors had half-size presses, not full-size presses. Therefore, as an accommodation, the bid specifications asked for bidders to submit unit prices for printing eight-page press forms for letter-size pages that can be printed on half-size presses; it did not request pricing for printing 16-page press forms for letter-size pages, as those cannot be printed on half-size presses. The bid specifications, however, requested bidders to submit unit prices for "folding" eight-page and 16-page letter-size signatures because paying at the 16-page rate generally is more cost efficient than the eight-page rate.
DAS held pre-bid meetings plaintiff attended where, according to DAS, the ordering, pricing and payment procedures were explained to the bidders. The competitive sealed bid ("CSB") form on which bidders submitted their bids to DAS expressly notified prospective bidders that "the state's requirements for itemizing and invoicing work produced under this contract often differ from standard commercial practices." To allow DAS to determine the lowest overall bid for the term contract, the bidders submitted prices on their CSB for the various printing and binding services on a line item basis which the bidders weighted and multiplied, based on DAS' estimate of items to be purchased over the term of the contract.
The CSB's submitted by the three bidders were opened on August 9, 1996, with plaintiff, a minority-owned printing business in Dayton, Ohio, submitting a bid with the lowest overall amount of $410,301.67. Morris Printing submitted a bid with an overall amount of $888,470.09, and Graphic Action submitted a bid with an overall amount of $1,098,725.20. Because plaintiff's bid was significantly lower than the others, DAS contacted plaintiff prior to awarding the contract to advise plaintiff of its low bid and to ask plaintiff to confirm its prices. Plaintiff confirmed its prices on August 12, 1996. On September 25, 1996, representatives of DAS visited plaintiff's printing facility to review the bid, go over contract procedures, and determine whether plaintiff had the equipment capacity to handle the contract. Despite DAS' concerns that plaintiff did not have a printer with enough capacity to handle the contract, plaintiff was ultimately awarded the term contract.
DAS issued several purchase orders to plaintiff from October to December 1996 for various jobs plaintiff was to perform under the contract. As provided in Paragraph 47 of the contract, DAS supplied the paper for the printing jobs. For the first two jobs, DAS sent 17 1/2; inch by 22 inch paper, which fit plaintiff's presses. Thereafter, however, DAS sent standard stock size paper, 35 inches by 22 inches, that plaintiff was required to cut in half for use on its presses. According to DAS, contractors routinely cut full size paper stock, if necessary, to fit its press. Pursuant to the express terms of Paragraph 62 of the contract, no charges were paid to plaintiff for cutting or slitting paper prior to presswork. Plaintiff did not reject the full-size paper and did not request payment for cutting it.
Plaintiff experienced difficulty in keeping up with the volume of work and, in February 1997, asked to be excused from the two-year contract. DAS allowed plaintiff to withdraw without penalty. A dispute subsequently arose between the parties regarding discrepancies in pricing between certain purchase orders DAS issued and invoices plaintiff submitted for the work plaintiff performed pursuant to the purchase orders.
The first two purchase orders DAS issued to plaintiff specified that printing would be paid at the eight-page press form rate of $8 per 1,000 press forms and "folding" would be paid at the eight-page signature rate of $29.64; those prices reflected the unit prices plaintiff quoted for those items on its CSB. Upon completing those two jobs, plaintiff submitted invoices that reflected the quantities and unit prices stated on the purchase orders, and plaintiff ultimately was paid accordingly.
The remaining purchase orders DAS issued specified printing would be paid at the eight-page press form rate of $8, but folding would be paid at the 16-page signature rate of $30.95, the unit price plaintiff quoted on its CSB for 16-page folding of letter-size paper. When plaintiff completed those remaining jobs, plaintiff submitted invoices, after the contract had terminated, that were inconsistent with the purchase orders. Specifically, plaintiff invoiced DAS for two foldings at the eight-page signature rate for each 16-page signature folding specified on the DAS purchase order. For example, if a purchase order stated DAS would pay for 100 signatures at plaintiff's 16-page signature rate of $30.95, for a total price of $3,095, plaintiff billed DAS for 200 signatures at its eight-page signature rate of $29.64, for a total invoice price of $5,928 for the folding work. Thus, plaintiff's invoice for folding 1,600 pages would be almost twice the amount DAS' purchase order stated DAS would pay for the folding work.
DAS withheld payment from plaintiff until plaintiff revised its invoices to match the purchase order prices and quantities DAS specified, and DAS ultimately paid the revised amount to plaintiff. Although plaintiff revised its invoices accordingly, it reserved the right to collect the amounts it claimed to be due and owing. It thereafter commenced this action for breach of contract, asserting DAS wrongfully withheld full payment of the invoices plaintiff submitted, and claiming DAS owed plaintiff $43,550.69 plus interest for amounts plaintiff originally invoiced but DAS did not pay. The central issue concerned the appropriate price plaintiff was to be paid for "folding": whether plaintiff should have been paid at the rate for folding 16-page signatures, the price DAS specified it would pay for the work, or whether plaintiff should have been paid at double the eight-page signature rate, as plaintiff asserted in its breach of contract claim.
During the bench trial held on plaintiff's action for breach of contract, DAS entered a stipulation it owed plaintiff an as yet undetermined amount, later stipulated to be $8,539.35 plus prejudgment interest, on one of its purchase orders. The trial court indicated it would include the stipulated amount in favor of plaintiff in its judgment.
On July 24, 2001, the trial court entered judgment for DAS. In its decision, the trial court found a contract existed, its terms were clear and unambiguous, and DAS did not breach the contract as plaintiff asserted. The trial court concluded that "[i]n compensating plaintiff for folding at the sixteen-page signature rate and refusing to reimburse plaintiff for folding double at the eight-page signature rate, defendant was simply holding plaintiff to the price it listed on the original bid and the specifications outlined in the various purchase orders." (Decision, 3-4.) The trial court neglected to include in its judgment the stipulated amount of $8,539.35 plus interest in favor of plaintiff.
Plaintiff appeals and assigns nine errors. Plaintiff, however, fails to argue the assignments of error separately in its brief, as required under App.R. 16(A). See, also, App.R. 12(A)(2). To facilitate an analysis of plaintiff's assignments of errors, we present them as plaintiff argued them in its brief:
 I. The trial court erred in failing to enter judgment awarding plaintiff $8,539.35 plus interest, in accordance with the parties' stipulation.
 II. The trial court erred in finding, as a matter of law, that DAS had not breached the terms of the printing contract.
 III. The trial court erred when it used parol evidence to interpret terms of the printing contract it had found to be clear and unambiguous.
 IV. The trial court erred in finding: (1) plaintiff did not have capacity to fold 16-page signature forms, (2) plaintiff had to cut 16-page signatures in half and then fold them as two 8-page signatures, (3) plaintiff's unit prices for folding were substantially below other bidders, and (4) unit pricing structures for folding were discussed at a pre-bid meeting.
In its first assignment of error, plaintiff asserts the trial court erred in failing to incorporate into the court's judgment the parties' stipulation, filed on April 16, 2001, that DAS owes plaintiff $8,539.35, plus prejudgment interest from March 3, 1997 to the date of judgment, on DAS' purchase order 7P1195. DAS concedes it owes that amount to plaintiff for purchase order 7P1195, and agrees the judgment should have included the amount. Plaintiff's first assignment of error is sustained.
In its second assignment of error, plaintiff asserts the terms of the printing contract are clear and unambiguous and the trial court erred in finding as a matter of law that DAS had not breached Paragraphs 47 and 62 of the printing contract. Plaintiff contends: (1) pursuant to the plain language of Paragraph 47 of the contract, DAS should have furnished paper to plaintiff that was 17 1/2; inches by 22 inches in size as the "appropriate" size paper for plaintiff's half-size press, and (2) pursuant to the plain language of Paragraph 62 of the contract that states "[t]he contractor shall charge for binding operations from the appropriate prices itemized in the contract," plaintiff should have been paid the unit price itemized in the contract for folding an eight-page signature form when it performed the work of folding an eight-page signature form. Plaintiff maintains its interpretation of the contract provisions is the only reasonable interpretation, but asserts if any other interpretation is reasonable, then by law the contract is ambiguous and must be construed against DAS, the party who drafted it.
To prove a breach of contract claim, a plaintiff must show: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff. Allied Erecting 
Dismantling Co. v. Uneco Realty Co. (2001), 146 Ohio App.3d 136, 142.
Plaintiff argues extensively on appeal that DAS breached Paragraph 47 of the contract when it failed to provide plaintiff with 17 1/2; inch by 22 inch paper; instead, DAS provided paper that was 35 inches by 22 inches in size, which plaintiff had to cut for use on its presses. Paragraph 47 of the contract states in part:
 PAPER FURNISHED BY THE STATE: When DAS furnishes paper, the kind and quantity of paper will be specified for each order. Paper will be furnished in the most appropriate standard mill sizes for each order, and the equipment on which its production is planned.
Even assuming DAS breached Paragraph 47 of the contract by failing to furnish the "most appropriate" size paper, plaintiff expressly agreed in the trial court, in response to DAS' request for admissions, that plaintiff did not seek damages in this lawsuit for any expenses associated with cutting paper DAS delivered to it under the term contract. (Plaintiff's Response to Defendant's Request for Admission No. 2.) Plaintiff's president, Edward Anthony, testified in accord. (Tr. I, 104-105, 174.) He further stated he was aware of the provision in the contract that expressly states no charges would be paid for cutting paper prior to presswork, and testified he did not request payment from DAS for cutting the paper to fit plaintiff's presses. (Tr. I, 104-105.) See, also, Paragraph 62 of Contract ("No charges for cutting or slitting paper prior to presswork shall be paid").
Damages are an essential part of a breach of contract claim, and without them plaintiff cannot maintain a claim for breach of contract. Metropolitan Life Ins. Co. v. Triskett Illinois, Inc. (1994),97 Ohio App.3d 228, 235 ("To recover on a breach-of-contract claim, the claimant must prove not only that the contract was breached, but that the claimant was thereby damaged"). See, also, Dulaney v. Jallaq (1998), Franklin App. No. 98AP-227 (holding breach of contract claim is irrelevant without damages). Accordingly, to the extent plaintiff argues DAS breached Paragraph 47 of the term contract by providing plaintiff with "inappropriate" size paper for plaintiff's presses, plaintiff's claim fails because it failed to prove damages arising from the alleged breach.
Plaintiff additionally contends in its second assignment of error, that DAS breached the clear and unambiguous terms of Paragraph 62 of the contract, which states in pertinent part:
 BINDERY: The contractor shall charge for bindery operations from the appropriate prices itemized in the contract. * * * The contractor shall be required to perform all bindery operations itemized as specification in the contract.
Plaintiff asserts the price plaintiff charged for folding eight-page signatures was the "appropriate price" pursuant to the plain language of Paragraph 62 of the contract because it was the price plaintiff itemized on its CSB for that work. Contending the language of the contract is clear and ambiguous and plaintiff's interpretation of the contract terms is the only reasonable interpretation, plaintiff further asserts DAS' interpretation, adopted by the trial court, is unreasonable in holding plaintiff should be paid for folding a 16-page signature when in fact plaintiff folded eight-page signatures. Plaintiff maintains that, as a result, DAS breached the contract when it refused to pay plaintiff the "appropriate" eight-page folding price for doing the eight-page signature folding work.
The construction of a written contract is a matter of law for the court. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241; McConnell v. Hunt Sports Ent. (1999), 132 Ohio App.3d 657, 675. "A Government contract should be interpreted as are contracts between individuals, with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument." S M Constructors, Inc. v. City of Columbus (1982), 70 Ohio St.2d 69, 71, quoting Hollerbach v. United States (1914), 233 U.S. 165, 171-172, 34 S.Ct. 553.
Generally, the terms of a contract are to be given their ordinary meaning unless manifest absurdity results or some other meaning is clearly evidenced from the face or overall content of the contract. Shifrin v. Forest City Enterprises, Inc. (1992), 64 Ohio St.3d 635, 638; McConnell, supra. When the terms of the contract are unambiguous and clear on their face, the court does not need to go beyond the plain language of the contract to determine the rights and obligations of the parties and the court must give effect to the contract's express terms. DiGioia Bros. Excavating, Inc. v. Cleveland Dept. of Public Utilities, Division of Water (1999), 135 Ohio App.3d 436, 446. A writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth. (1997), 78 Ohio St.3d 353, 361; McConnell, supra.
Although plaintiff contends this court need apply only the plain language of Paragraph 62 to conclude as plaintiff asserts, that the "appropriate price" to be paid plaintiff is the eight-page folding rate plaintiff itemized in its CSB, we are required to read the provision regarding "appropriate price" in pari materia with the other pertinent provisions that are part of the term contract. Foster Wheeler; Mesarvey, Russell Co. v. Boyer (1992), Franklin App. No. 91AP-974. Accordingly, we consider the provisions in plaintiff's CSB and the purchase orders issued by DAS under the term contract, both of which are part of the "contract." See Contract, Standard Terms and Conditions for Bids, paragraph 3 at 14.
The submission of a purchase order is deemed an offer which may then be accepted or rejected. American Bronze Corp. v. Streamway Products (1982), 8 Ohio App.3d 223, 227. Plaintiff's president, Edward Anthony, admitted that the purchase orders DAS issued were DAS' orders for specific jobs under the term contract, and he testified he looked at all the purchase orders carefully before doing the work ordered. The purchase orders DAS issued to plaintiff specified the size and number of pages to be produced for each job, as well as the prices to be paid for the printing and binding work for the respective jobs. The prices stated on the purchase orders for the work reflected the prices itemized on plaintiff's CSB and the quantity of a specified item, such as 16-page folding, that was needed to complete a particular job. The particular purchase orders at issue stated plaintiff was to be paid for printing at the eight-page rate and paid for "folding" at the 16-page rate, with the rates reflecting the unit prices plaintiff quoted in its bid. Plaintiff did not reject the purchase orders at the prices stated, but instead indicated its "acceptance" by completing the printing jobs ordered in the purchase orders. See American Bronze, supra.
Pursuant to Paragraphs 30 and 31 of the term contract, upon completion of a printing job, plaintiff was required to submit an invoice to DAS based on the "[d]escription, quantity, unit price, total price, etc., as appears on the purchase order/purchase request" and any change orders approved by DAS for the job. (Emphasis added.) Paragraph 31 expressly states, twice, that "[a]ny changes to an order not approved by DAS shall not be paid." Plaintiff's president testified he saw this provision before he submitted plaintiff's bid and agreed its language is clear.
Plaintiff did not demonstrate it obtained approval for a change in the pricing structure for "folding" from the 16-page rate specified in the purchase orders to an eight-page rate. Brenda Anthony, plaintiff's chief financial officer, testified that prior to submitting the disputed invoices, she sent no written request for such a change, she had no documentation of a request for or verbal authorization by DAS for a folding rate change, and she received no written change order from DAS approving such a change, even though plaintiff had requested and obtained approval for change orders for other items, and was paid accordingly. Rather, plaintiff testified she submitted the invoices reflecting an eight-page folding rate, not the 16-page folding rate reflected on the unchanged purchase orders, based on her "belief" DAS would pay the invoices because DAS knew plaintiff was folding eight-page, not 16-page, signatures.
Plaintiff also did not demonstrate that DAS, either expressly or through its conduct, waived the contractual provisions requiring approval for changes in purchase orders. "Knowledge, and even acquiescence" by DAS that plaintiff was doing eight-page folding rather than 16-page folding "is not enough for recovery" by plaintiff where the contract expressly provides that invoices are to be based on the prices specified in the purchase order, and further provides that changes to a purchase order not approved will not be paid. See Foster Wheeler at 362-364.
Plaintiff contends the terms of the contract are ambiguous to the extent a construction of the contract results in an interpretation different from plaintiff's interpretation, and therefore the contract should be construed against DAS as the drafter of the contract. See 2 Restatement of the Law 2d, Contracts (1979) 105, Contractual Obligations, Section 206. Even if we assume an ambiguity existed in the contract's terms, the general rule of construction does not apply in this case because the contract expressly provides that any ambiguities shall be construed in favor of the state. See Contract, Instructions for Submitting Bids, paragraph 1 at 12.
Plaintiff next argues it should be paid at the eight-page folding rate because it was the work plaintiff actually performed. Plaintiff notes, and DAS agrees, it is physically impossible to fold a 16-page signature from an eight-page press form. Despite the apparent logic of plaintiff's argument, the contract nowhere states that folding eight-page press forms, arising out of plaintiff's eight-page printing, necessarily will be compensated at the eight-page folding rate. To the contrary, the contract states the purchase orders specify the rates and total price to be paid for the folding work for each job. No "manifest absurdity" results from the state structuring payment and setting its prices at the most economical rate for the job to be done. McConnell, supra. Where a contractor accepts a public contract for a stated amount, it has no right to unilaterally modify the contract to provide for payment on a basis different from that provided for in the contract. DiGioia Bros. at 454. Thus, where plaintiff accepted and completed the jobs outlined on the purchase orders, it could not then unilaterally modify the contract to provide for payment on a basis different from that provided for in the purchase orders. Id. Even if plaintiff had to fold two eight-page signatures to produce the equivalent of one 16-page signature, the terms of the contract provided that payment for this work would be at the 16-page signature rate.
Plaintiff further argues that, where the sizes being printed and folded are the same, in this case printing and folding eight-page forms, charge for a larger size for folding than is being charged for printing is against industry standards. However, the record reflects plaintiff was on written notice that industry standards would not prevail regarding pricing and invoicing. Specifically, page three of plaintiff's bid form, which is a part of the contract, expressly provided in the section entitled "Instruction to Bidders" that "the state's requirements for itemizing and invoicing work produced under this contract often differ from standard commercial practices." Moreover, evidence was presented that DAS verbally notified the bidders in pre-bid meetings regarding the pricing and payment structure to be utilized in the term contract and, in particular, that contractors would be paid a larger rate for folding than for printing. Accordingly, industry standards are not controlling in this case.
Finally, in support of its breach of contract claim, plaintiff maintains DAS should be estopped from denying payment to plaintiff at the eight-page folding rate for all purchase orders because plaintiff charged, and DAS paid, for folding at the eight-page rate on the first two purchase orders DAS issued. Plaintiff's estoppel argument is unpersuasive because it overlooks the fact that DAS merely paid according to the terms of the contract as reflected on the purchase orders, both when it paid plaintiff at the eight-page folding rate stated on the first two purchase orders and when it paid plaintiff at the 16-page folding rate stated on the remaining purchase orders. DAS claimed it made a mistake in specifying payment at the eight-page folding rate rather than a 16-page folding rate on the first two purchase orders, but it nevertheless paid according to the terms specified.
Plaintiff entered into the contract and was similarly bound by its terms. Plaintiff may have simply realized, belatedly, it made a mistake in the bid it submitted and it wished to escape the harsh result. Plaintiff's claim, that it did not know until its invoices were rejected that it should have structured its bid price for 16-page folding to include two eight-page foldings, is undercut by the testimony of plaintiff's president, who admitted on cross-examination that two weeks after plaintiff submitted the bid for this contract, plaintiff bid another contract in which its rate for folding 16-page signatures was twice that of its rate for eight-page signatures. In comparison, plaintiff's unit price for 16-page folding for this contract was only slightly higher than its price for eight-page folding.
As the Sixth Circuit Court of Appeals has observed, "parties that contract with the government are held to the letter of the contract — irrespective of whether the contract terms appear onerous from an ex post perspective, or whether the contract's purpose could be effectuated in some other way — under the maxim that '[m]en must turn square corners when they deal with the Government.'" U.S. ex rel. Compton v. Midwest Specialties, Inc. (1998), 142 F.3d 296, 302; see, also, DiGioia at 453 (adopting the maxim). A contract does not become ambiguous by reason that its operation may work a hardship upon one of the parties. S M Constructors at 71; Robert W. Clark, M.D., Inc. v. Mt. Carmel Health (1997), 124 Ohio App.3d 308, 319.
When the contract provisions at issue are construed as a whole, the terms are clear and unambiguous that, upon completion of a printing job, plaintiff was required to invoice DAS, and DAS was required to pay plaintiff, at the price(s) stated on the purchase order for the job, unless plaintiff obtained approval for a change. Because plaintiff did not obtain approval for a change in the folding price, DAS did not breach the contract by holding plaintiff to the terms of payment specified in the purchase orders. Plaintiff's second assignment of error is overruled.
In its third assignment of error, plaintiff asserts the trial court found the terms of the contract to be clear and unambiguous but then erroneously used parol evidence to construe the terms of the printing contract in favor of the drafter, DAS. Specifically, plaintiff argues that in construing the "appropriate price" to be charged for bindery operations pursuant to Paragraph 62, the trial court improperly relied upon parol evidence that DAS explained the pricing and payment structure at pre-bid meetings.
"Parol evidence is admissible only if the terms of the contract are ambiguous and then only to interpret, but not to contradict, the express language." Ohio Historical Soc. v. Gen. Maintenance Engineering Co. (1989), 65 Ohio App.3d 139, 146. Here, parol evidence was inadmissible to construe the terms of the contract because the terms are clear and unambiguous, as the trial court properly determined. However, contrary to plaintiff's assertion, the trial court did not rely upon the referenced evidence to construe the terms of the contract. Rather, the trial court discussed the evidence in relation to plaintiff's claim that it should not be held to the pricing terms stated on the purchase orders because it lacked notice of the pricing and payment structure for "folding" work. Based upon the evidence, the court, at least implicitly, rejected plaintiff's claim it had no notice of the pricing structure before the time plaintiff submitted its bid. The court then construed the terms of the contract by applying the plain language of its provisions. Plaintiff's third assignment of error is overruled.
Finally, in its fourth assignment of error, plaintiff asserts the trial court made various erroneous factual findings that the court then relied on in making its decision. Plaintiff argues the trial court's decision should be reversed to the extent it rests on incorrect factual findings.
Plaintiff first contends, and DAS generally agrees, evidentiary support was lacking for the trial court's statements that "plaintiff was not able to fold a sixteen-page signature because it did not possess the necessary equipment" and "plaintiff cut the sixteen-page signatures in half and folded them as two eight-page signatures." (Decision, 2-3.) Even if the two statements are not supported by the evidence, plaintiff has not shown it was materially prejudiced by the statements such that the result at trial would have been different without the apparent errors. The result here is dictated by the contract terms, not by the trial court's description of plaintiff's equipment or the process plaintiff used. Accordingly, the errors do not warrant reversal.
Plaintiff next claims the trial court erred in finding "plaintiff's bid prices for folding were considerably lower than the other contractors' bids." (Decision, 4.) Plaintiff maintains the undisputed evidence shows plaintiff's folding prices were lower than one bidder and higher than the other bidder.
According to the evidence presented at trial concerning the bids submitted for the term contract, plaintiff's overall bid of $410,301.67 was significantly lower than the bids of the other two contractors, $1,098,725.20 and $888,470.09. Plaintiff is correct that its unit price of $29.64 for eight-page folding was considerably lower than the price of one bid at $42.92, and slightly higher than the other bid at $25.79. However, plaintiff's unit price of $30.95 for 16-page folding was lower than the price of either of the other bidders, being slightly lower than the one bid at $32.13, and almost half the price of the other bid at $58. Although the unit price plaintiff submitted for eight-page folding was slightly higher than one of the other bids, the evidence generally supports the trial court's statement that plaintiff's bid prices for folding were lower than the other bids and supports a finding that plaintiff's overall bid was significantly lower than the other two bids.
Finally, plaintiff contends the trial court erred in finding that the other bids submitted for the contract supported DAS' testimony that the unit pricing structure for folding was discussed at pre-bid meetings. Specifically, the court stated:
 * * * The evidence shows that defendant outlined its pricing and payment structure to prospective bidding companies at pre-bid meetings. Specifically, defendant explained that it would make payment for folding signature pages at the largest folding rate. Representatives of plaintiff were in attendance at the pre-bid meetings; however, they denied that the aforementioned pricing and payment structure was discussed. Nevertheless, examination of the other bids submitted for the project as well as the pre-bid meeting agenda establishes that the structure was, in fact, discussed. (Decision, 4-5.)
In testimony presented at trial, Brenda Anthony denied DAS explained the pricing and payment structures at the pre-bid meetings. Diane Ford, DAS' printing standards supervisor, contradicted Brenda Anthony and testified she was "confident" the pricing structure for folding was explained at the pre-bid meetings. The bid submitted by Morris Printing, in which its unit price for 16-page folding, $58, is markedly higher than its price for eight-page folding, $42.92, lends support to DAS' contention that the payment structure was explained to the bidders. In any event, because the evidence is conflicting regarding whether a pre-bid discussion was held concerning the pricing and payment structure, the question was properly one of credibility for the court to resolve, and it decided in favor of DAS. Because plaintiff has pointed to no erroneous finding that warrants reversal, we overrule plaintiff's fourth assignment of error.
Accordingly, plaintiff's second, third, and fourth assignments of error are overruled, plaintiff's first assignment of error is sustained, and the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded to the trial court to incorporate the stipulation of the parties, filed April 16, 2001, into the judgment.
Judgment affirmed in part and reversed in part; case remanded with instructions.
LAZARUS and DESHLER, JJ., concur.