**XCEL MOLD AND MACHINE, INC., Plaintiff,**

v.

**DEVAULT INDUSTRIES, L.L.C., Defendant.**

 2008-Ohio-2693.]

Canton Municipal Court,
Stark County, Ohio.

No. 2007 CVF 10304.

Decided April 11, 2008.

Drew A. Gonyias, for plaintiff.

J. Michael Gatien, for defendant.

BELDEN, Judge.

{¶ 1} This lawsuit was brought by XCEL Mold and Machine, Inc. ("XCEL") for breach of contract against DeVault Industries, L.L.C. ("DeVault"). XCEL seeks $9,000 for the manufacture and delivery of 60 trigger-assembly units for custom-built shotguns. DeVault argues in defense that the agreed-upon price for the 60 units was really $1,080, not $9,000, and that DeVault had already paid for the units. In fact, DeVault asserts, when XCEL negotiated the $1,080 check that was marked "payment in full," it completed an accord and satisfaction of the debt it claims in this case.

{¶ 2} Many of the facts are not in dispute, although some important ones are. Sometime in the early months of 2007 Dennis DeVault (defendant's president) met with Bob Cain (plaintiff's president), Bob Johnson( plaintiff's vice-president), and Tom Marcelli (the department head of plaintiff's wire EDM department). DeVault was looking to outsource the manufacturing of trigger-assembly units for its shotguns. XCEL is a company that specializes in "wire cutting" of steel, a process that can be used to make such units. Mr. DeVault provided diagrams of what DeVault wanted; XCEL used the diagrams to determine that it would take about 7.5 hours of machine time to wire out two units. The parties agreed that

XCEL would produce a small number of units in a test run and that DeVault would pay for them. This would give XCEL a better idea of how much it would cost it to manufacture a greater quantity of the units.

{¶ 3} XCEL made six trigger-assembly units, and also prototypes of several other parts. XCEL sent an invoice to DeVault for $1,750. DeVault paid the invoice and wanted XCEL to manufacture more trigger-assembly units.

{¶ 4} DeVault sent a purchase order ("P.O. No. 27") to XCEL on April 19, 2007. The description on P.O. No. 27 reads: "Wire burn trigger housings as per drawing. Parts were done before material is 1045 and should be enough material to provide 60 units." The quantity of products to be manufactured, however, is 20 units, and the price is $18 per unit. Mr. DeVault testified that this price was derived from dividing the $1,750 total of the first, trial run, order by total number of pieces received in that order, 97 pieces. He acknowledges that only six of those pieces were trigger housings; the other 91 pieces were smaller in size.

{¶ 5} XCEL received P.O. No. 27, but what happened next is one of the facts in dispute in this case. Mr. Cain testified that he called Mr. DeVault on the phone within a few days and told him that XCEL could not manufacture the units for a price of $18 each. Mr. Cain says that Mr. DeVault in so many words told him to ignore the $18 figure; he had to put something on the invoice but it was not controlling. According to Mr. Cain, Mr. DeVault told him to go ahead and manufacture the units and that they would figure out a fair price later.

{¶ 6} Mr. DeVault's recollection of this phone call differs substantially from Mr. Cain's recollection. Mr. DeVault says that nothing was said about price and that the only topic of discussion concerned quantity. He said that Mr. Cain told him that he needed to manufacture more than 20 units to offset the set-up costs for manufacturing the item. Mr. DeVault says that he told Mr. Cain to go ahead and make more units with the materials DeVault provided.

{¶ 7} Sometime after the units had been made, Bob Johnson called and asked if DeVault was going to make XCEL stick to the $18 per unit price. Mr. DeVault says that he told Mr. Johnson that yes, he was going to hold XCEL to the $18 price. (Mr. Johnson did not mention this phone conversation in his testimony.)

{¶ 8} Mr. DeVault said that he received a phone call from Bruce Cain after the phone call from Bob Johnson. The message that Mr. Cain delivered was that $18 per unit was not enough. Mr. DeVault says that he did not agree to a higher price. This took place after the units had been delivered to DeVault. They came in two shipments, one May 2, 2007, and the other June 11, 2007.

{¶ 9} The next thing that DeVault received was a bill for $9,000, dated June 25, 2007. It is unclear what direct communications took place after DeVault received

this bill, and on October 19, 2007, DeVault mailed a check for $1,080. The check states in the lower left-hand corner: "pymt in full PO# 27 60 pcs@18.00 ea."

{¶ 10} Again there is disagreement as to what happened next. Bruce Cain testified that after receiving the check, he attempted to call Dennis DeVault but was not able to reach him on the phone. He states that he talked to an employee who was not authorized to negotiate the matter.

{¶ 11} Dennis DeVault, on the other hand, says that Mr. Cain was able to get hold of him. According to Mr. DeVault, Mr. Cain called him "crazy" and said that he was sending the check back.

{¶ 12} What is undisputed is that XCEL did not send the check back. XCEL negotiated the check and deposited the proceeds in its bank account. On December 20, 2007, however, XCEL mailed its own check for $1,080 to DeVault. In the cover letter, Mr. Cain states: "We do not and will not accept your check number 2746 as payment in full for your purchase order number 27 and our invoice number 34937 dated June 25, 2007." This lawsuit followed.

## Was There a Binding Contract?

{¶ 13} XCEL argues that P.O. No. 27 is not legally enforceable, particularly the rate of $18 per unit. The plaintiff states that P.O. No. 27 is nothing but a mere proposal, that it never accepted the $18 per unit price, and that the actual agreement between the parties was a verbal agreement that XCEL would manufacture and deliver 60 units for $9,000.

{¶ 14} DeVault, of course, begs to differ. DeVault relies upon the Uniform Commercial Code's ("UCC") version of the Statute of Frauds, R.C. 1302.04, which states:

(A) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

(B) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to its contents is given within ten days after it is received.

{¶ 15} The defendant thus is the party that asserts that there is a binding written contract, P.O. No. 27. The plaintiff is the party that claims that there is no binding written contract, but that there is a binding oral contract.

{¶ 16} Who is correct? There is no dispute that this is a business deal between "merchants," as defined by the UCC.[1] "Generally, the submission of a purchase order is viewed as being an offer which may then be accepted or rejected by the seller."[2] Under division (B) of R.C. 1302.04, the plaintiff had ten days to give written notice of objection. According to Bruce Cain, he gave verbal notice of objection to the quote of $18 per unit within "a few days" of receiving P.O. No. 27 (an assertion denied by Dennis DeVault), but the statute requires *written* notice of objection.[3] XCEL concedes that no such written notice was ever given, arguing that in a business relationship built on trust, such a thing is unnecessary.

{¶ 17} The court notes that the quantity of units ordered on the face of P.O. No. 27, 20 units, turned out to be an "incorrect" number. In the end, 60 units were manufactured and delivered. Both XCEL and DeVault agreed upon this change, however. The question remains as to whether there ever was a contract whereby DeVault agreed to pay $9,000 for the 60 units, or whether XCEL agreed to make and deliver the 60 units for $1,080 instead.

{¶ 18} XCEL is asking this court to enforce a contract whereby it sold DeVault goods for $9,000. Both parties agree that there is no writing sufficient to indicate that a contract for sale for that amount was made between them and signed by the party against whom enforcement is sought, namely DeVault. Consequently, the statute of frauds bars this court from enforcing any alleged agreement with the $9,000 price tag.

{¶ 19} The analysis does not end there. The parties did have some agreement whereby XCEL agreed to manufacture and deliver a product to DeVault, and DeVault agreed to pay something for it. DeVault did pay $1,080 to XCEL. XCEL cashed the check, kept the proceeds for two months, then issued its own check for the same amount in an attempt to "retender" the $1,080 to DeVault. (DeVault has not cashed XCEL's check.[4]) This leads to our next issue.

---

1. R.C. 1302.01(A)(5).

2. *Am. Bronze v. Streamway Prods.* (1982), 8 Ohio App.3d 223, 8 OBR 295, 456 N.E.2d 1295, paragraph one of the syllabus.

3. See *Burkhart v. Marshall* (1989), 63 Ohio App.3d 281, 578 N.E.2d 827 (a telephoned notice of objection is insufficient).

4. See Defendant's Exhibit "F".

## Was There an Accord and Satisfaction?

{¶ 20} Both parties cite R.C. 1303.40, "Accord and satisfaction by use of instrument," as controlling authority for this issue. That statute provides:

If a person against whom a claim is asserted proves that that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, that the amount of the claim was unliquidated or subject to a bona fide dispute, and that the claimant obtained payment of the instrument, all of the following apply:

(A) Unless division (B) of this section applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

{¶ 21} DeVault argues that the notation on the check that it constituted payment in full of P.O. No. 27 classifies it as an instrument as described in the statute. The amount of XCEL's claim, DeVault contends, is "subject to a bona fide dispute." The language on the instrument that it is meant to be payment in full is a "conspicuous statement."

{¶ 22} XCEL, on the other hand, looks to division (B) for rescue. The language states:

(B) Subject to division (C) of this section, a claim is not discharged under division (A) of this section if either of the following applies:

(1) The claimant, if an organization, proves both of the following:

(a) Within a reasonable time before the person against whom the claim is asserted tendered the instrument to the claimant, the claimant sent a conspicuous statement to the person that communications concerning disputed debts, including an instrument tendered as full satisfaction of a debt, are to be sent to a designated person, office, or place.

(b) The instrument or accompanying communication was not received by that designated person, office, or place.

(2) The claimant, whether or not an organization, proves that within ninety days after payment of the instrument, the claimant tendered repayment of the amount of the instrument to the person against whom the claim is asserted. Division (B)(2) of this section does not apply if the claimant is an organization that sent a statement complying with division (B)(1) of this section.

{¶ 23} XCEL points to the fact that it sent its own check for $1,080 to DeVault on December 21, 2008, within 90 days of October 19, 2008, when DeVault sent its check to XCEL. This, XCEL argues, falls squarely within the language of R.C. 1303.40(B)(2), and the claim is therefore not discharged.

**{¶ 24}** XCEL's reliance on division (B)(2) is misplaced. The very first words of the division state that it is subject to the provisions of division (C). Division (C) declares: "A claim is discharged if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim."

**{¶ 25}** Bruce Cain, the president of XCEL, was fully aware that DeVault's check was tendered in full satisfaction of the claim when XCEL received the check. He testified that he called DeVault to protest. His company then went ahead and cashed the check. The provisions of division (C) apply to the facts in this case, overriding the provisions of division (B)(2).

**{¶ 26}** The Official Comment to the corresponding section of the UCC[5] explains the thinking behind division (B). "It is designed to protect the claimant against inadvertent accord and satisfaction. If the claimant is an organization payment of the check might be obtained without notice to the personnel of the organization concerned with the disputed claim."[6] The examples given are large department stores and public utilities. If a customer sends a check with the "payment in full" language on a disputed debt to the maintenance department and it is cashed, no one who was concerned with the disputed claim would know about it. Therefore an "organization" may designate that payments be sent to a department that would have knowledge of whether a claim is disputed or not, and payments marked "payment in full" sent to other departments would not count as an accord and satisfaction.

**{¶ 27}** The provision in division (B)(2) to allow a claimant to tender repayment of "a full satisfaction check" within 90 days "is also designed to prevent inadvertent accord and satisfaction."[7] The rationale for this procedure is to protect, once again, very large companies doing business with thousands of customers. The drafters noted that some companies would be reluctant to send notices to customers to send "full satisfaction checks" to a special designated person, office, or place, because customers might become confused, and send all checks, even those for undisputed debts to that special designated person, office, or place, thereby overwhelming that person, office, or place. "Thus, much of the benefit of rapid processing of checks may be lost."[8]

---

5. UCC 3–311.

6. Official Comment to UCC 3–311, ¶ 5.

7. Id., ¶ 6.

8. Id.

{¶ 28} XCEL does not appear to have the problems described in the Official Comments. There is no evidence to indicate that it receives such a large number of checks that it needs a special designated person, office, or place to handle disputed ones. The language of the Official Comment that relates to division (C), however, puts the nail in the coffin:

> 7. Subsection (c) [Division (B) of R.C. 1303.40] is subject to subsection (d) [Division (C) of R.C. 1303.40]. If a person against whom a claim is asserted proves that the claimant obtained payment of a check known to have been tendered in full satisfaction of the claim by 'the claimant or an agent of the claimant having direct responsibility with respect to the disputed obligation,' the claim is discharged even if (i) the check was not sent to the person, office, or place required by a notice complying with subsection (c)(1) [R.C. 1303.40(B)(1) ], or (ii) the claimant tendered repayment of the amount of the check in compliance with subsection (c)(2)[R.C. 1303.40(B)(2) ].

{¶ 29} Mr. Cain, the president of XCEL, had direct responsibility with respect to the disputed obligation. The check went to him, or at least he knew that XCEL had the check, and that the check stated that it was payment in full. We know this because he said that he called DeVault to complain about it. Then XCEL obtained payment on the check. Under R.C. 1303.40, it makes no difference that XCEL tendered repayment of the amount of the check; there was an accord and satisfaction by operation of law, and the claim was discharged. XCEL could have protected itself by not cashing the check. It did not do so. It is therefore ordered that the defendant, DeVault Industries, L.L.C., is granted judgment as to the plaintiff's, XCEL Mold and Machine, Inc.'s, complaint; and it is further ordered that the plaintiff's complaint is dismissed with prejudice at plaintiff's costs.

So ordered.